UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DAVID GARCIA,

Petitioner,

– against –

VICTOR T. HERBERT,

Respondent.

MEMORANDUM, JUDGMENT & ORDER

Petition under 28 U.S.C. § 2254

02-CV-02052

**JACK B. WEINSTEIN, Senior United States District Judge:**

**Parties**

David Garcia

Victor T. Herbert

**Appearances**

**Jeffrey G. Pittell**
Maher & Pittell LLP
42-40 Bell Blvd.
Suite 302
Bayside, NY 11361
516-829-2299

**Avshalom Yotam**
Kings County District Attorney's
Office
350 Jay Street
Brooklyn, NY 11201
718-250-3492

Table of Contents

I.  Introduction ........................................................................................................................... 4

    A.  Vindictive Sentencing ..................................................................................................... 5

    B.  Habeas Corpus Procedure ............................................................................................... 6

    C.  Counsel on Collateral Attacks ........................................................................................ 7

II.  Background .......................................................................................................................... 9

    A.  Facts ................................................................................................................................ 9

        1.  Offenses of Conviction .............................................................................................. 9

        2.  Conviction, Plea Offers, and Sentencings ............................................................... 10

        3.  Timing of Events Leading to and Including Sentencing .......................................... 13

            a.  First Three Crimes (December 1997) ................................................................. 13

            b.  Fourth Crime: Canal Jewelry Store (January 12, 1998) ..................................... 13

            c.  Plea offer by District Attorney of 15 to 30 years for a plea of guilty to all crimes; rejected by defendant (exact date unknown). ...................................................... 13

            d.  Conviction Following First Trial for Canal Jewelry Store Robbery (October 9, 1998) ................................................................................................................... 13

            e.  Plea Offer Made by Trial Judge to Avoid Trial for the Additional Three Crimes Conveyed to Garcia by Stand-By Counsel (October 14, 1998) ......................... 13

            f.  Rejection by Defendant of Plea Offer (between October 14–26, 1998) ............. 13

            g.  Sentencing Following First Trial for Canal Jewelry Store Robbery (October 26, 1998) (50 years) ............................................................................................... 13

            h.  Conviction Following Second Trial for First Three Crimes (January 11, 1999)  13

            i.  Sentencing Following Second Trial for Canal Jewelry Store Robbery (January 21, 1999) (75 years consecutive to the already imposed 50 years) ..................... 13

    B.  Procedural History ........................................................................................................ 14

        1.  Chart of Procedural History ..................................................................................... 14

        2.  Direct Appeal and Habeas Petition ......................................................................... 23

    C.  Evidentiary Hearing ..................................................................................................... 26

        1.  Katheryn Martone ................................................................................................... 26

        2.  Respondent's Evidence ........................................................................................... 29

            a.  State Exhibits E–1 and E–2 ............................................................................... 30

            b.  Deanna Rodriguez .............................................................................................. 32

    3.   Findings of Fact ................................................................................. 48

III.   Law ................................................................................................. 51

    A.   Source of Authority for Review of Motion..................................... 51

        1.   Successive Habeas Petitions ..................................................... 51

        2.   Rule 60(b) Motions .................................................................. 52

        3.   Distinguishing Between Successive Rule 60(b) Motions and Successive Habeas Corpus Petitions ............................................ 53

        4.   Residual Writ of Habeas Corpus ............................................... 54

    B.   Exhaustion of State Remedies ...................................................... 57

        1.   New York State Court Sentencing Jurisdiction and Avenues of Review ................. 58

        2.   New York Court of Appeals Presentment ..................................... 60

        3.   Comity and Presentment to the New York Court of Appeals ................... 64

    C.   AEDPA Review ............................................................................ 66

    D.   Vindictive Sentencing Claim ......................................................... 68

        1.   Doctrine .................................................................................. 68

        2.   Trial Penalty ........................................................................... 70

IV.   Application of Law to Facts .............................................................. 73

    A.   Nature of Instant Habeas Motion................................................... 73

        1.   Characterizing an Application as Successive Rule 60(b) Motion Rather Than as Successive Habeas Petition .................................... 73

        2.   Timeliness of Motion ............................................................... 75

        3.   60(b) Motion Following Federal Court of Appeals' Decision ................. 75

        4.   Residual Writ of Habeas Corpus ............................................... 76

    B.   Exhaustion of State Remedies ...................................................... 76

        1.   Argument in New York State Appellate Division............................. 76

        2.   Exhaustion in New York Court of Appeals..................................... 79

    C.   Vindictive Sentencing .................................................................. 82

V.   Conclusion ..................................................................................... 84

VI.   Judgment ....................................................................................... 86

VII.   Stay ............................................................................................... 86

VIII.  **Appendix A**: State Direct Appeal and Federal Habeas Corpus Petition Timelines......... 88

IX.    **Appendix B**: Relevant Portion of Petitioner's State Appellate Division Brief................ 89

X.    **Appendix C**: Petitioner's Initial Application for Leave to the New York Court of Appeals ........................................................................................................................ 94

I.        Introduction

This motion-petition requires reevaluation of David Garcia's ("Garcia," "movant," "petitioner," "applicant," or "defendant") many unsuccessful *pro se* applications in State and federal courts over some twenty years seeking a ruling that his State sentence of 125 years imprisonment was unconstitutional.  It now is apparent to this court that, based upon clear and convincing evidence, on the facts and law, his sentence was unconstitutionally vindictive.  But, before that sentence can be set aside so a proper sentence can be imposed, this court must determine whether the petitioner has exhausted his State remedies under 28 U.S.C. § 2254 and has otherwise complied with that statute.

The case lies at the intersection of three questionable aspects of United States' correctional and penological jurisprudence:  (1) the penalty for going to trial—a defendant often receives a harsher sentence for choosing to go to trial than he would have if he accepted a plea bargain, in effect forcing him to forgo trial; (2) the diminished force of the writ of habeas corpus because of procedural statutes, rules, and decisions that have been designed or interpreted by the courts to favor state respondents' defenses over individual defendants' complaints of constitutional violations; and (3) the lack of a right to counsel in criminal collateral attack proceedings that can lead to, and compound, difficulties in curing constitutional error.

A special injustice is presented by the instant case, when after some twenty years of *pro se* litigation by movant, petitioner's newly court appointed counsel is effectively raising a substantial claim to a constitutional sentencing violation.  This memorandum addresses the

constitutional issue now raised—vindictive sentencing. Courts' failures to fully examine relevant issues earlier is no excuse for persisting in error. "[I]t [is] the duty of every judge and every court to examine its own decisions, and the decisions of other courts without fear, and to revise them without reluctance." *Baker v. Lorillard*, 4 N.Y. 257, 261 (1850).

This is a difficult case: persuasive arguments support a decision both for and against Garcia.

### A.    Vindictive Sentencing

Garcia was convicted in State court after committing a string of robberies in Brooklyn. His guilt and the fairness of his convictions are not in question. That his crimes were serious is uncontestable. But, this court finds that petitioner's sentence to prison was vindictive as a matter of constitutional law; more than 100 years were added to his period of incarceration because he decided to go to trial rather than plead guilty.

There were apparently two plea offers, one of 15 to 30 years in prison by an Assistant District Attorney, and a second of a "flat" 20 years incarceration by the State trial judge. *See* Sept. 13, 2018 Hr'g Tr. 15:22–16:9. The 20 year offer by the State Court forms the basis of the current memorandum.

Petitioner's sentence of 125 years imprisonment after trial was grossly disproportionate to the sentence of 20 years incarceration he was offered by the State judge if he pled guilty to four separate robberies. The constitutional right to trial was clear: the added time for going to trial—105 years in prison—was impermissible. *See* U.S. Const. amends. VI (right to trial) & XIV (right to due process). In State court he was warned by "stand-by trial counsel" that his failure to plead guilty would result in his "surely never walk[ing] out of a prison again" because the judge would not accept "defiance." *See infra* Section II(A)(2).

A "vindictive sentence" is unconstitutional. The principle is that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). The constitutional framework does not require a finding that the judge imposed the sentence with actual vindictive intent. But, the sentence inequalities must not give rise to an inference of vindictiveness based on circumstances that "shock[] the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952) (Frankfurter, J.).

The practice of imposing incarceratory sentences of terms of years that will expire decades after a defendant's death, in circumstances such as exist in the instant case, is assumed to be an inappropriate expression of judicial anger. The punishment is not for the crime alone, but in large part for going to trial.

### B.    Habeas Corpus Procedure

Habeas corpus procedural rules have increasingly been interpreted by federal courts as favoring state respondents, leaving defendants who have meritorious substantive constitutional claims with no adequate procedural path to relief. *Cf.  United States v. Hoskins*, 905 F.3d 97, 102–03 (2d Cir. 2018) (describing habeas review under 28 United States Code Section 2255 as "narrowly limited," requiring defendants to "hurdle [a] high bar."). As the late-Judge Stephen Reinhardt put it:

> The collapse of habeas corpus as a remedy for even the most glaring of constitutional violations ranks among the greater wrongs of our legal era. Once hailed as the Great Writ, and still feted with all the standard rhetorical flourishes, habeas corpus has been transformed over the past two decades from a vital guarantor of liberty into an instrument for ratifying the power of state courts to disregard the protections of the Constitution.

Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences*, 113 Mich. L. Rev. 1219, 1219 (2015).

Rules blocking enforcement of the Great Writ, some of which were created by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), should not be employed to deprive people of constitutionally protected rights. *Cf.* U.S. Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus *shall not be suspended*, unless when in Cases of Rebellion or Invasion the public Safety may require it." (emphasis added)).

### C. Counsel on Collateral Attacks

Garcia unsuccessfully appealed his conviction in State court. His federal habeas petition was denied. He prosecuted dozens of other challenges to the sentence. Many pages are needed to touch upon the extensive procedural history of this litigation repeatedly denying relief. *See* Declaration of Respondent in Opposition to Fourth Rule 60(b) Motion to Vacate Order Denying Petition for Writ of Habeas Corpus ("Decl. in Opp'n"), ECF No. 114, June 29, 2018; *infra* Section II(B)(1); Appendix A.

The long delay in coming to grips with petitioner's vindictive sentencing claim is due in large measure to the fact that Garcia has proceeded without counsel. Denial of counsel for him was pursuant to a ruling of this court. *See infra* Section II(B)(2). Adverse decisions followed from the general rule that defendants making collateral attacks on criminal judgments are not entitled to court-appointed counsel. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions . . . and we decline to so hold today. . . . [T]he right to appointed

counsel extends to the first appeal of right, and no further."). Passive acquiescence by this court in that denial of counsel is largely to blame for the failure to fully consider the writ years ago.

A vindictive sentencing claim, it can be argued, was first raised before the State's intermediate appellate court and then in the New York Court of Appeals. This court's habeas opinion denying the writ did not directly address the substance of the vindictive sentencing claim. *See* Mem., J. & Order, ECF No. 39, Sept. 25, 2003. An experienced practitioner, such as the attorney appointed on the instant motion—if appointed years ago—would almost certainly have brought this court's attention almost immediately to the serious federal constitutional due process question raised by petitioner's sentence.

Counsel plays an integral role in all criminal cases. An attorney can be particularly helpful in habeas corpus proceedings and other collateral attacks that are governed by complicated procedural and substantive rules of state and federal courts. A growing number of federal judges have called for greater access to counsel in all cases where there is the possibility of injustice. *See, e.g.*, *Watson v. United States*, 179 F. Supp. 3d 251, 257 (E.D.N.Y. 2016) ("There is a clear, unmet need for counsel in immigration cases. Had an attorney been available to him at the outset, plaintiff probably promptly would have been declared a citizen and released almost immediately after he was arrested, if he were arrested at all."), *aff'd in part, rev'd in part*, 865 F.3d 123, 136 (2d Cir. 2017) (Katzmann, C.J., concurring in part and dissenting in part) ("This case is a striking illustration of the [negative] consequences that stem from the government's broad discretion to initiate detention and removal proceedings, coupled with the sometimes limited ability even a U.S. citizen has to assert a valid claim of citizenship in the absence of the assistance of counsel."); *Davis v. Moroney*, 857 F.3d 748, 752 (7th Cir. 2017) (Posner, J.) ("Davis needs help—needs it bad—needs a lawyer desperately. He did not have a

fair opportunity to prosecute his case."); Jed Rakoff, *Only the "Relatively Rich" Can Afford to Hire a Lawyer*, N.Y.L.J., May 3, 2018 ("It is a terribly sad fact that our legal system has priced itself out of the reach of most ordinary Americans. . . . [T]he involvement of a lawyer makes a huge difference.").

The present rule of no right to counsel on a collateral attack should be stood on its head. The presumption should be that a defendant is entitled to an attorney in a collateral attack on a sentence unless it has been demonstrated that the claim is duplicitous or clearly meritless. The present rule of law to the contrary should be changed by statute, court rulings, or both. Defendants need counsel in serious collateral attacks on their sentences for unconstitutionality as well as at trial.

The court recognizes that acceptance of this view would place considerable strain on pro bono attorneys and members of the Criminal Justice Act panel. It would cost considerable money. Yet, routine assignment of attorneys would be of considerable assistance to judges faced with collateral attacks and probably result in quicker determination than now takes place in many cases.

II.     Background

A.     Facts

1. Offenses of Conviction

In December 1997, petitioner committed three armed robberies in Brooklyn. Decl. in Opp'n ¶¶ 5–7. Garcia and an accomplice entered various establishments armed with handguns and demanded loot. *Id.* They took jewelry and personal belongings from employees. *Id.*

On January 12, 1998, Garcia committed a fourth armed robbery at the Canal Jewelry Store; he entered and threatened two employees with a gun. *Id.* ¶ 8. After forcibly taking

jewelry from a case guarded by an employee, defendant aimed two shots at him.  *Id.*  Plexiglas stopped the bullets.  *Id.*

### 2. Conviction, Plea Offers, and Sentencings

Petitioner was charged with attempted murder and multiple counts of armed robbery.  *See* Memorandum of Law in Support of Petitioner's *Pro Se* Letter Motion, ECF No. 111, May 1, 2018.  The counts were severed:  the robbery and attempted murder at Canal Jewelry were to be tried first, followed by a separate trial for the other three armed robberies.  *Id.* at 3.  David Epstein, Esq. was appointed counsel for defendant.  *Id.*  Prior to the first trial, defendant successfully moved to represent himself *pro se*.  *Id.*  But his attorney remained as legal advisor to Garcia throughout both trials.  *Id.*

Before his first trial, Garcia received an offer from the prosecution of 15–30 years incarceration in exchange for a guilty plea to all four robberies.  *See* Sept. 13, 2018 Hr'g Tr. 15:22–16:2.  Although the offer was made by the prosecution, not the court, it was communicated to defendant by the State trial judge on the record.  *Id*.  Garcia rejected this offer.

Defendant was convicted of attempted murder and robbery by the jury at the first trial. Dec. in Opp'n ¶ 12.  Following this trial, petitioner received a letter from his stand-by counsel informing him of a plea offer by the judge.  Counsel urged him to plead guilty to the remaining charges in exchange for the reduced sentence.  The full text of the letter is set out below.  It accurately indicates by clear and convincing evidence an offer of a "flat" twenty years to cover all crimes:

LAW OFFICES OF

DAVID B. EPSTEIN
123 HICKS STREET
BROOKLYN, NEW YORK 11201

TEL. (718) 852-6753                                                    FAX (718) 852-7398

October 14, 1998

Dear Dave,

I am truly sorry about how things went last week. If it is any constellation, I spoke to the jury, and they were convinced that it was you on the video. If this was in fact the case it seems that you may have had problems no matter who tried your case.

However, I firmly beleive that you did accomplish something important by representing yourself. This judge can be tough, but deep down inside he has compassion. I believe that you really humanized yourself by acting as your own attorney. You were not disruptive, intimidating, disrespectful, and if anything you did an admirable job for yourself. Obviously, the judge saw these things based on the comment he made to you after the verdict.

So where does this leave you? On paper there is no reason for a judge to want to help you. I mean this based on your previous conviction as well with your present charges. But, I see that based on what was stated above the judge wants to give you, what he considers a break.

Of course you have a right to fight the remaining charges on the indictment, either acting as your own attorney or by having me try the case. However, the judge indicated that he will take into account your position on the remaining charges when he sentences you next week. On this conviction alone you face a maximum of a straight 50 year sentence.

The judge has indicated that if you plea to the remaining charges, he would consider a flat 20 to cover everything. Of that you actually do 85%, which comes out to seventeen years. Putting aside your parole situation, you could still come out when you are about 50 years old, and have som semblence of a life. Otherwise, to put it harshly, you will surely never walk out of a prison again.

It is your decision, but remember you have nothing to gain by going to trial on the other cases, since if the judge sees defiance he will sentence you to more than the 20 years just on this conviction (which is his legal right).

I hope you take this letter in the spirit it is written in, not to force your hand but to give you sound advice.

Sincerely,

David B. Epstein, Esq.

Letter from David B. Epstein, Esq. to David Garcia, ECF No. 140-1 at 3, Oct. 14, 1998 ("Epstein Ltr."). Petitioner refused to accept the offer. The contemporaneous circumstances prove by

clear and convincing evidence that the trial judge made the offer to defendant's stand-by counsel at an off the record sidebar, intending it to be delivered to Garcia. *See infra* Section II(C)(3).

On October 26, 1998, a sentencing hearing was held for the convictions following the first trial. *See* Oct. 26, 1998 Sent. Hr'g Tr., ECF No. 111, Ex. A. Petitioner complained of stomach pains and requested that the hearing be adjourned. *Id.* at 3:21–23. The request was denied. *Id.* at 5:3–16.

> Garcia expressed concern about the letter he received from Epstein:
>
> Your Honor, I have a letter here with Mr. Epstein's own stationery, a true letter which he wrote me just after the jury verdict and I am not going to go into every specific detail of his letter. It is highlighted down here and he says, "Otherwise, to put it harshly, you will surely never walk out of prison again." And he also said since the judge, if the judge sees the facts he will sentence you to more than 20 years, since the judge is in due defiance.

*Id.* at 8:23–9:9.

The prosecution requested the "maximum time in prison allowed under the law." *Id.* at 5:18–7:15. The trial judge followed the prosecution's sentencing recommendation, imposing two consecutive terms of 25 years imprisonment. *Id.* at 11:11–22.

Trial on the remaining counts resulted in additional convictions of eight counts of robbery in the first degree. *See* Jan. 21, 1999 Sent. Hr'g Tr., ECF No. 111, Ex. B.

A second sentencing hearing was held following the second trial on January 21, 1999. The government again sought the maximum sentence: "[S]entence him to the maximum amount of time possible, which would be the 75 years to run consecutive with the 50 years he is presently doing." *Id.* at 4:3–6. Three 25 year sentences were then imposed, each to run consecutive with each other and the 50 year sentence previously imposed. *Id.* at 6:11–8:24. The total term of imprisonment for Garcia was 125 years, 105 years longer than the "flat 20" years the court offered if he pled guilty to avoid the second trial.

### 3. Timing of Events Leading to and Including Sentencing

A partial chronological record is as follows:

a.    First Three Crimes (December 1997)

b.    Fourth Crime: Canal Jewelry Store (January 12, 1998)

c.    Plea offer by District Attorney of 15 to 30 years for a plea of guilty to all crimes; rejected by defendant (exact date unknown).

d.    Conviction Following First Trial for Canal Jewelry Store Robbery (October 9, 1998)

e.    Plea Offer Made by Trial Judge to Avoid Trial for the Additional Three Crimes Conveyed to Garcia by Stand-By Counsel (October 14, 1998)

f.    Rejection by Defendant of Plea Offer (between October 14–26, 1998)

g.    Sentencing Following First Trial for Canal Jewelry Store Robbery (October 26, 1998) (50 years)

h.    Conviction Following Second Trial for First Three Crimes (January 11, 1999)

i.    Sentencing Following Second Trial for Canal Jewelry Store Robbery (January 21, 1999) (75 years consecutive to the already imposed 50 years)

B.    Procedural History

1. Chart of Procedural History

In the 19 years following his convictions, petitioner has filed a substantial number of appeals, post-trial motions, and collateral attacks in State and federal courts aimed at sentencing and other issues.  The procedural history and characterizations of all motions set forth below are based on the respondent's declaration dated June 29, 2018:

| Date/Date Filed | State/Federal Court | Type of Proceeding | Issues Raised | Outcome |
|---|---|---|---|---|
| 10/9/1998 | State Trial Court | Trial | Tried before jury for crimes at Canal Jewelry Store | Guilty of attempted murder in the second degree and robbery in the first degree |
| 10/26/1998 | State Trial Court | Sentencing | | 50 years (25 for each crime to run consecutively) |
| 11/10/1998 | State Trial Court<br><br>Appellate Division<br><br>Court of Appeals | **First 440.10** Motion to Vacate Judgement | Ineffective assistance of trial counsel and denial of request for new counsel | Trial Court denied without hearing (4/6/1999)<br><br>Appellate Division denied application for leave (4/15/1999)<br><br>Court of Appeals denied application for leave (6/28/1999) |
| 1/11/1999 | State Trial Court | Trial | Tried before jury for other three robberies | Guilty of 8 counts of robbery in the first degree |
| 1/21/1999 | State Trial Court | Sentencing | | 75 years (three terms of 25 years to run consecutively) |
| 5/6/1999 | State Trial Court<br><br>Appellate Division | **Second 440.10** Motion to Vacate Judgement | <u>Rosario</u> violations for failure to turn over discovery materials<br><u>Brady</u> violation failure to turn over Statements made to police | Trial Court denied without hearing (7/1/1999)<br><br>Appellate Division denied application for leave (11/16/1999) |
| 1/3/2000 | State Trial Court | **Third 440.10** Motion to | Newly discovered evidence | Trial Court denied without hearing (3/14/2000) |

14

| | | | | |
|---|---|---|---|---|
| | Appellate Division | Vacate Judgement | | Appellate Division denied application for leave (7/14/2000) |
| December 2000 | State Appellate Division<br><br>Court of Appeals | Direct Appeal (First Sentence) | The trial court:<br>1. Improperly determined suppression issue<br>2. Improperly denying defendant's request for new counsel<br>3. Erred in permitting witness to resume the witness stand to identify defendant<br>4. Improperly sentenced defendant to consecutive terms of imprisonment | Appellate Division affirmed conviction (6/18/2001)<br><br>Court of Appeals denied application for leave (1/28/2002) |
| December 2000 | State Appellate Division<br><br>Court of Appeals | Direct Appeal (Second Sentence) | The trial court:<br>1. Improperly determined suppression issue<br>2. Improperly exercised its discretion in denying defendant's request for the assignment of new counsel<br>3. Defendant's sentence should be modified in the interest of justice given its disparity with the plea offer (citing case law on federal constitutional vindictiveness issue). *See supra* Section II(A)(2). | Appellate Division affirmed conviction (6/18/2001)<br><br>Court of Appeals denied application for leave (1/28/2002) |
| 7/13/2001 | State Trial Court<br><br>Appellate Division | **Fourth 440.10** Motion to Vacate Judgement | Newly discovered evidence | Trial Court denied without hearing (10/31/2001)<br><br>Appellate Division denied application for leave (1/24/2002) |
| 3/13/2002 (ECF No. 1) | Federal District Court<br><br>Second Circuit Court of Appeals | Federal <u>Habeas Corpus</u> Motion | - Trial court erred in denying suppression motion and permitting witness to identify defendant<br>- Defendant's home illegally searched | District Court denied petition (9/25/2003) (ECF No. 39)<br><br>Second Circuit Court of Appeals denied petitioner's motion for a certificate of |

| | | | - State failed to turn over discovery<br>- Defendant denied his right to counsel<br>- Consecutive sentences should be modified to run concurrently<br>- Aggregated sentence of 125 years should be modified in the interest of justice given its disparity with the plea offer | appealability and dismissed the appeal (4/13/2004) (ECF No. 52) |
|---|---|---|---|---|
| 10/15/2002 | Federal District Court | Application for Appointment of Counsel | Petitioner requests appointment of counsel because he does not have funds to hire an attorney | Application denied by magistrate judge (10/24/2002) (ECF No. 24) |
| 4/25/2003 | Federal District Court | Reassignment | Case reassigned to undersigned district judge | |
| 6/18/2004 (ECF No. 53) | Federal District Court<br><br>Second Circuit Court of Appeals<br><br>United States Supreme Court | Reconsideration of Federal <u>Habeas Corpus</u> Motion | Certain records had not been reviewed by the district court | District Court denied petition for reconsideration (7/16/2004)(ECF No. 55)<br><br>Second Circuit Court of Appeals denied certificate of appealability (8/12/2004)<br><br>Supreme Court denied petition for writ of certiorari (1/10/2005) |
| 5/6/2004 | State Appellate Division<br><br>Court of Appeals | **First** <u>Coram Nobis</u> **Application** (Coram Nobis is the designation in respondent's brief) | Appellate counsel on the State direct appeal from the first trial was ineffective | Appellate Division denied application (9/27/2004)<br><br>Court of Appeals denied application for leave to appeal (11/19/2004) |
| 11/29/2004 | State Trial Court<br><br>Appellate Division | **First** Motion to Disqualify Judge | Requested that the trial judge recuse himself and retract his previously rendered decision | Trial Court denied motion (2/9/2005)<br><br>Appellate Division denied application for leave to appeal (6/13/2005) |
| 1/21/2006 | State Trial Court | **Fifth 440.10** Motion to | Police officers, the prosecutors, and defense | Trial Court denied without hearing (6/23/2006) |

| | | | | |
|---|---|---|---|---|
| | Appellate Division | Vacate Judgement | counsels "teamed up" in order to compromise defendant's case and secure a guilty verdict | Appellate Division denied application for leave to appeal (9/1/2006) |
| 12/15/2006 | State Appellate Division<br><br>Court of Appeals | **Second** <u>Coram Nobis</u> Application | Assigned appellate counsel was ineffective for failing to make specific claims on appeal | Appellate Division denied application (4/24/2007)<br><br>Court of Appeals dismissed application for leave to appeal (6/25/2007) |
| 1/26/2007 (ECF No. 58) | Federal District Court<br><br>Second Circuit Court of Appeals | **First** Application for permission to File Second Federal <u>Habeas Corpus</u> Petition | | District Court transferred application to Second Circuit Court of Appeals (2/7/2007)(ECF No. 59)<br><br>Second Circuit Court of Appeals denied motion (4/4/2007)(ECF No. 63) |
| 10/5/2007 | State Trial Court<br><br>Appellate Division<br><br>Court of Appeals | **First** State <u>Habeas Corpus</u> Petition | - His girlfriend was coerced into providing information<br>- The police lied and unlawfully searched his residence<br>- Lineup was suggestive<br>- Ineffective counsel<br>- Trial court erred in denying request for new counsel | Trial Court denied the motion (2/20/2008)<br><br>Appellate Division dismissed appeal (10/23/2008) |
| 5/12/2008 | Second Circuit Court of Appeals | **Second** Application to File Second Federal <u>Habeas Corpus</u> Petition | | Second Circuit Court of Appeals denied motion (6/11/2008) |
| 7/15/2008 | State Appellate Division<br><br>Court of Appeals | **Third** <u>Coram Nobis</u> Application | Assigned appellate counsel was ineffective | Appellate Division denied application (9/30/2008)<br><br>Court of Appeals dismissed application for leave (1/6/2009) |
| 7/21/2008 | State Trial Court | **440.20** Motion to Set Aside Sentence | Pre-sentence report, relied on at trial, has false allegations | Trial Court denied motion (11/7/2008) |

| | | | | Appellate Division denied application for leave (1/8/2009) |
|---|---|---|---|---|
| 12/22/2008 (ECF No. 70) | Federal District Court<br><br>Second Circuit Court of Appeals | **First** Rule 60(b) Motion | Court did not carefully consider defendant's ineffective assistance of counsel claim | District court denied motion (1/8/2009) (ECF No. 71)<br><br>Second Circuit Court of Appeals dismissed appeal (4/1/2009) (ECF No. 76) |
| 12/23/2008 | State Trial Court | **Second** State <u>Habeas Corpus</u> Petition | There were no challenging procedures available since appeals and applications had been denied | Trial Court dismissed petition (10/21/2009) |
| 1/23/2009 | State Trial Court | **Sixth 440.10** Motion to Vacate Judgement | Defense counsel ineffective for not persuading him to accept an offer made by the trial court after defendant was found guilty at the first trial | Trial Court denied motion without a hearing (5/19/2009) |
| 11/9/2009 | State Trial Court<br><br>Appellate Division | **Seventh 440.10** Motion to Vacate Judgement | - Sixth Amendment violation<br>- ineffective counsel<br>- Error for the trial court not to relay an offer directly to defendant when he was proceeding pro se instead of communicating through defense counsel | Trial Court denied motion without a hearing (5/19/2010)<br><br>Appellate Division denied application for leave (11/17/2010) |
| 11/30/2009 | State Trial Court<br><br>Appellate Division | **Third** State <u>Habeas Corpus</u> Petition | - The Confrontation Clause was violated<br>- The lineup was suggestive<br>- Police unlawfully searched defendant's car and residence<br>- Trial counsel was ineffective<br>- Police improperly planted one of defendant's fingerprints at one of the crime scenes | Trial Court denied petition (6/26/2010)<br><br>Defendant withdrew his application for leave from Appellate Division (10/18/2010) |
| 12/7/2009 | State Appellate Division | **Fourth** <u>Coram Nobis</u> Application | Assigned appellate counsel was ineffective for not | Appellate Division denied application (4/20/2010) |

| | | | raising a Confrontation Clause | Court of Appeals denied application for leave (9/2/2010)<br><br>United States Supreme Court denied certiorari (4/18/2011) |
|---|---|---|---|---|
| | Court of Appeals<br><br>United States Supreme Court | | | |
| 5/3/2010 | State Appellate Division | Article 78 Petition | Trial Court should be precluded from performing or taking action against the defendant | Appellate Division denied the petition and dismissed the proceeding (11/9/2010) |
| 11/23/2010 (ECF No. 78) | Federal District Court<br><br>Second Circuit Court of Appeals<br><br>United States Supreme Court | **Second** Rule 60(b) Motion | District Court had not carefully reviewed the <u>habeas</u> petition | District Court denied motion and denied certificate of appealability (6/1/2011)(ECF No. 87)<br><br>Second Circuit Court of Appeals denied certificate of appealability (10/14/2011) (ECF No. 95)<br><br>United States Supreme Court denied certiorari (4/30/2012) |
| 12/22/2010 | State Trial Court<br><br>Appellate Division<br><br>Court of Appeals<br><br>United States Supreme Court | **Fourth** State <u>Habeas Corpus</u> Petition | - Defendant's constitutional rights had been violated when he was arrested without probable cause<br>- Malicious prosecution | Trial Court denied petition without hearing (1/4/2011)<br><br>Appellate Division affirmed denial of application (5/24/2011)<br><br>Court of Appeals denied application for leave (9/11/2012)<br><br>Supreme Court denied writ of certiorari (4/29/2013) |
| 12/22/2010 | State Appellate Division<br><br>Court of Appeals | **Fifth** <u>Coram Nobis</u> Application | Assigned appellate counsel was ineffective for not raising a claim that defendant had been deprived of his right to be present at the first trial | Appellate Division denied application (5/17/2011)<br><br>Court of Appeals denied application for leave (9/1/2011) |

| | | | | |
|---|---|---|---|---|
| | United States Supreme Court | | | Supreme Court denied petition for writ of certiorari (10/1/2012) |
| 3/29/2011 | State Trial Court<br><br>Appellate Division<br><br>Court of Appeals<br><br>United States Supreme Court | **Eighth 440.10** Motion to Vacate Judgement | Newly discovered evidence | Trial Court denied motion (6/11/2011)<br><br>Appellate Division denied application for leave (2/16/2012)<br><br>Court of Appeals dismissed application for leave (6/18/2012)<br><br>Supreme Court denied petition for writ of certiorari (10/15/2012) |
| 10/24/2011 | State Trial Court<br><br>Appellate Division | Motion for Permission to File 440.10 and 440.20 Motions | - Wrongfully sentenced to consecutive terms of imprisonment<br>- Photographs erroneously admitted into evidence | Trial Court denied request to file additional papers pursuant to 440.20; granted request to file pursuant to 440.10 (11/17/2011)<br><br>Appellate Division denied leave application for 440.20 motion (2/16/2012) |
| 12/6/2011 | State Trial Court<br><br>Appellate Division<br><br>Court of Appeals<br><br>United States Supreme Court | **Ninth 440.10** Motion to Vacate Judgement | Defense counsel was ineffective for not preventing introduction of improper evidence | Trial Court denied motion (6/25/2012)<br><br>Appellate Division denied application for leave (2/7/2013)<br><br>Court of Appeals dismissed application for leave (3/27/2013)<br><br>Supreme Court denied petition for writ of certiorari (10/7/2013) |
| 3/6/2012 | State Appellate Division<br><br>Court of Appeals | **Sixth** Coram Nobis Application | Appellate Division had not paid sufficient attention to appellate counsel's challenges | Appellate Division denied application (8/22/2012)<br><br>Court of Appeals denied application for leave (12/28/2012) |

| | | | | |
|---|---|---|---|---|
| | United States Supreme Court | | | Supreme Court denied petition for writ of certiorari (June 3, 2013) |
| 7/12/2012 | State Trial Court | Request for Correction of Rap Sheet | Errors in rap sheet | Trial Court directed District Attorney's Office to review rap sheet and make request for corrections (12/20/2012) |
| 9/28/2012 | State Trial Court<br><br>Appellate Division | **Tenth** 440.10 Motion to Vacate Judgement | Pretrial counsel was ineffective for failing to obtain discovery | Trial Court denied motion (3/28/2013)<br><br>Appellate Division denied application for leave (7/15/2013)<br><br>Court of Appeals dismissed application for leave (9/13/13) |
| 10/5/2012 | State Appellate Division<br><br>Court of Appeals<br><br>United States Supreme Court | **Seventh** Coram Nobis Application | Appellate counsel ineffective for failing to raise claims | Appellate Division denied application (3/20/2013)<br><br>Court of Appeals denied application for leave (5/31/2013)<br><br>Supreme Court dismissed petition for writ of certiorari (10/7/2013) |
| 2/22/2013 (ECF No. 98) | Federal District Court | **Third** Rule 60(b) Motion | The District Court should have considered the sentence was excessive because the issue had been exhausted | District Court denied motion (3/21/2013) (ECF No. 99) |
| 7/2/2013 | State Trial Court | Request for Grand Jury Minutes | Claimed he never received Grand Jury testimony minutes | Trial Court denied motion (10/15/2013) |
| 7/8/2013 | State Trial Court | **Second** Motion to Disqualify Judge | | Trial Court denied motion (10/15/2013) |
| 7/23/2013 | State Trial Court<br><br>Appellate Division | Motion for Permission to File 440.10 Motion | Wanted to argue:<br>- Lineup was suggestive<br>- Ineffective counsel<br>- Detectives had forced defendant to wear certain clothes in custody | Trial Court denied request to file motion (12/11/2013)<br><br>Appellate Division denied application for leave (7/14/2014) |

| | | | | |
|---|---|---|---|---|
| 1/10/2014 | State Trial Court | Motion for Permission to File 440.10 Motion | Wanted to argue:<br>- Prosecution failed to meet its <u>Rosario</u> obligations<br>- Ineffective counsel | Trial Court denied request to file motion (5/20/2014)<br><br>Appellate Division denied application for leave (1/15/2015) |
| 1/10/2014 | State Appellate Division | **Eighth** <u>Coram Nobis</u> Application | Appellate Division had made certain factual errors in affirming convictions. | Appellate Division dismissed application (6/4/2014) |
| 5/16/2014 | State Trial Court | Motion for Permission to File 440.10 Motion | Wanted to argue:<br>- Ineffective counsel | Trial Court denied request to file motion (12/5/2014) |
| 10/28/2014 | State Appellate Division<br><br>Court of Appeals | **Ninth** <u>Coram Nobis</u> Application | Appellate counsel was ineffective for failing to raise claims | Appellate Division denied application (4/8/2015)<br><br>Court of Appeals denied application for leave (6/16/2015) |
| 1/15/2016 | State Trial Court<br><br>Appellate Division | Motion for Permission to File 440.10 Motion | Wanted to argue:<br>- Newly discovered evidence<br>- Ineffective counsel | Trial Court denied request to file motion (2/5/2016)<br><br>Appellate Division denied application for leave (2/5/2016) |
| 4/6/2016 | State Trial Court | Motion for Permission to File 440.10 Motion | Defendant had new information related to police misconduct | Trial Court denied request to file motion (5/9/2016) |
| 5/23/2016 | State Trial Court | Motion for Permission to File 440.20 Motion | Defendant sought to re-litigate his consecutive sentences | Trial Court denied request to file motion (6/24/2016) |
| 7/5/2016 | State Trial Court<br><br>Appellate Division | Motion for Permission to File 440.10 Motion | Defendant had new information related to a witness | Trial Court denied request to file motion (7/26/2016)<br><br>Appellate Division denied application for leave (4/14/2017) |
| 2/3/2017 | State Appellate Division<br><br>Court of Appeals | **Tenth** <u>Coram Nobis</u> Application | Appellate counsel was ineffective for failing to raise a claim | Appellate Division denied application (8/2/2017)<br><br>Court of Appeals denied application for leave (10/5/2017) |

| 2/12/2018 | State Trial Court | Motion for Permission to File 440.10 Motion | Defendant did not receive certain discovery documents | Trial Court denied request to file motion (3/29/2018) |
| 10/13/2017 (ECF No. 101) | Federal District Court | **Fourth** Rule 60(b) Motion | Sentence was unconstitutionally vindictive | Counsel appointed on instant petition. |

2.   Direct Appeal and Habeas Petition

Garcia, represented by counsel, Ms. Katheryn Martone of Legal Aid, raised the following

*non constitutional* issue, among others, on his direct appeal from his sentences, before the New

York Appellate Division, Second Department:  "Appellant's *aggregate sentence of 125 years*

*should be modified in the interest of justice given its disparity with the plea offer*. U.S. Const.,

Amends. V, XIV; N.Y. Const., Art. I, §6; P.L. §70.25(2)."  Relevant Portions of Petitioner's

State Appellate Division Brief, Dec. 2000, Appendix B (emphasis added).  It also argued directly

that the defendant *was punished* for going to trial—a due process, constitutional vindictive claim:

> [A]ppellant was *improperly penalized for exercising his right to trial*. Before trial, the plea offer was fifteen to thirty years in exchange for his guilty plea to the charges contained in the indictment. After trial on all of the charges, appellant received an aggregate sentence of one hundred and twenty-five years a term of 75 years imposed upon the present convictions to be served consecutively to a term of 50 years imposed upon his October 26, 1998, convictions for the remaining charges in the indictment. Even taking into account the statutory limitation on the length of his sentence, *see* P.L. §70.30(1) (e) (vi), his sentence is approximately three times greater than that contemplated by the plea bargain. *See People v. Cosme*, 203 A.D.2d at 376; *see also Bordenkircher v. Hayes,* 434 U.S. 357, 363 (1979) ("*To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort*" [sic]).

*Id.* at 31 (emphasis added; page number in original).  This claim was based on prosecution's pre-

trial plea offer of 15–30 years, not the trial court's offer of 20 years for a guilty plea on all counts

made after the verdict in the first trial.  Ms. Martone explained her rationale for this decision in a

letter to Garcia.  She wrote:  "We cannot refer to the letter that Mr. Epstein wrote you regarding

the plea offer because it is not part of the record on appeal. However, the prosecutor's pre-trial plea offer was made on the record prior to commencement of the suppression hearings. We will be able to use that fact in our briefs." Ct. Ex. 3, Oct. 29, 2018 Hr'g at 20.

The Appellate Division ruled that the Sentence was not excessive. *People v. Garcia*, 284 A.D.2d 481 (2001).

An application for leave to appeal to the New York Court of Appeals was filed by Ms. Martone. It was made in three stages: first, on July 16, 2001, counsel filed a two-page letter enclosing copies of the briefs filed in the Appellate Division and requesting review of "*all issues outlined in defendant-appellant's briefs*." Petitioner's Initial Application for Leave to the New York Court of Appeals, July 16, 2001, Appendix C (emphasis in original).

A second letter, dated August 7, 2001, was filed "to augment the arguments contained in the Appellate Division briefs." *See* Supplemental Application for Leave, *People v. Garcia*, ECF No. 117, Ex. A, Aug. 7, 2001. It discussed one issue at length: use of the "fellow officer" rule to justify petitioner's arrest. *Id.* In a footnote on the last page of the brief, the issues of denial to the right of counsel and an unduly suggestive lineup were also raised. *Id.* Issues related to sentencing, including the disparity between the plea offer and sentence imposed were not raised. *Id.*

The District Attorney's Office opposed leave by the New York Court of Appeals in a letter dated August 17, 2001. *See* Opposition to Leave, ECF No. 117, Ex. B. The opposition addressed several issues raised before the Appellate Division, including an excessive sentencing issue. *Id.*

A brief reply was submitted by petitioner's counsel. *See* Reply in Support of Application for Leave, ECF No. 117, Ex. C, Aug. 21, 2001. No unconstitutional sentencing issue was suggested in that reply. *Id.*

After the New York Court of Appeals denied Garcia's application, *see* Certificate Denying Leave, ECF No. 117, Ex. D, Jan. 28, 2002, he filed a *pro se* petition for habeas corpus in the United States District Court for the Eastern District of New York. *See* Petition for Habeas Corpus, ECF No. 1, Mar. 13, 2002. He applied for appointed counsel, but the application was denied. Order, ECF No. 24, Oct. 24, 2002. The case was then reassigned to another judge. *See* Reassignment Order, Apr. 25, 2003.

The initial habeas petition in this court did not raise a claim related to the disparity between the plea offer and sentence imposed, but by application dated June 18, 2003 petitioner sought to add the following claim to his petition: "Defendant's aggregated sentence of 125 years should be modified *in the interest of justice* given its disparity with the plea offer." Decl. in Opp'n ¶ 36 (emphasis added). The application to amend the petition was granted, and the amendment is deemed made. *See* Order, ECF No. 37, June 30, 2003. A month later, Garcia, *pro se*, attached the Epstein Letter in a submission filed in support of his motion amend his petition. Ltr. from D. Garcia, ECF No. 140-1, July 24, 2003. Citing United States Constitutional Amendments V and XIV, as well as the Epstein Letter, he argued: "As a result of petitioner's conviction for both trials the petitioner received a total of 125 years. A sentence that should be modified in the interest of justice, given its disparity with the plea offer. U.S. Const., Amends. V, XIV; N.Y. Const., Art. I, §6; P.L. §70.25(2). <u>See: Enclosure</u> A Letter from Petitioner's Former Attorney and Later So Called Advisor: Dated10/14/98." *Id.*

The habeas petition in this court was denied. *See* Mem., J. & Order, ECF No. 39, Sept. 25, 2003. By Mandate, the Court of Appeals for the Second Circuit denied petitioner's motion for a certificate of appealability and dismissed the appeal because no "substantial showing of the denial of a constitutional right" was made. *See* Mandate, ECF No. 52, Apr. 13, 2004. A motion for reconsideration and three motions under Rule 60(b) were denied over the course of the next decade. *See* Appendix A; *supra* Section II(B)(1).

The instant motion to declare unconstitutional defendant's 125 years sentence on the ground of vindictiveness was filed on October 17, 2017. *See* Motion to Vacate, ECF No. 101. At this court's direction, counsel was appointed. Order, ECF No. 102, Nov. 2, 2017; CJA Appointment, ECF No. 103, Nov. 15, 2017.

C.    Evidentiary Hearing

The court held an evidentiary hearing, arguably in contradiction of 28 U.S.C. § 2254(e)(2) requiring the first evidentiary hearing to be held in State court.

The State court sentencing judge and stand-by trial counsel, two key witnesses, are deceased. Petitioner's counsel on direct appeal, Katheryn Martone, testified. The lead prosecutor in petitioner's trials and sentencings, ex-Assistant District Attorney Deanna Rodriguez, also testified.

1.    Katheryn Martone

Martone testified that she intended to raise the issue of vindictive sentencing—and had raised it—on Garcia's direct appeal to both the Appellate Division and New York Court of Appeals. About the Appellate Division brief, she stated:

> THE COURT: Well, we have the author right here. What was your intention in this section [referring to the emphasized portion of Appendix B, *infra*].

MS. MARTONE: Judge, it was my intention to raise the federal constitutional claim [in the brief to the Appellate Division], and I believed that . . . I was doing that by citing to the constitution and citing to the [United States] Supreme Court's authority and by quoting from the [United States] Supreme Court's case to punish a person because he has done what the law [allows him to do].

THE COURT: That's [] *Bordenkircher v. Hayes,* 434 U.S. 357 at 363, 1979.

MS. MARTONE: Yes.

THE COURT: But did you make both arguments on the justice side seeking the Appellate Division utilization of its power to reduce an unjust sentence, that is one that's too high, as well as the specific unconstitutionality based on vindictiveness?

MS. MARTONE: Yes. Appellate Division did in *People v. Cosme* . . . recognizing the federal constitutional violation, they reduced the defendant's sentence in the interest of justice. And I do not believe that by invoking the court's interest of justice review, that broad plenary review, within this point in any way undercuts the fact that I alerted the Appellate Division to the federal constitutional aspect of this claim that is that he was punished [for] exercising his right to trial. That was my intention, Judge . . .

THE COURT: Okay. Because that's what we're focusing on. We're not focusing on the justice jurisdiction of the Appellate Division? Right?

MS. MARTONE: (Nodding ["yes"]).

Sept. 13, 2018 Hr'g Tr. 6:20–8:4.

Ms. Martone then testified about raising the vindictiveness issue in the New York Court of Appeals.

THE COURT: So you went up to the Court of Appeals?

MS. MARTONE: Yes.

THE COURT: Which has the jurisdiction to review?

MS. MARTONE: Yes. . . .

THE COURT: Was it the practice in requesting that the Court of Appeals review [any] issue to refer to and in effect to include the argument in the appellate brief before the Appellate Division.

MS. MARTONE: Yes, Judge that's what this language was intended to accomplish. It was the practice of my office in response to Second Circuit decisions that had held that our letters, our follow-up letters in support of leave applications had narrowed somehow the scope of the requested review . . . [For a full discussion of case law from the Court of Appeals for the Second Circuit *see infra* Section III(B)(2).]

And so, Judge, by including that language in my initial application to the [New York Court of Appeals] . . . [i]t was my intention to raise all of the issues that were in the Appellate Division brief. . . . It was my intention to have the court review all of the issues in the Appellate Division brief.

THE COURT: The critical question was and is, were you raising before the New York Court of Appeals chief judge the constitutional issue which we have encapsulated in the word "vindictiveness" that you say you raised in this paragraph before the Appellate Division?

MS. MARTONE: Yes, Judge, I believe that I did.

THE COURT: And the chief judge had your brief in the Appellate Division?

MS. MARTONE: Yes.

THE COURT: As well as your letter saying, we request this court to consider and review all issues outlined in defendant-appellant's briefs. Now, was that the standard practice then [in your office]?

MS. MARTONE: It[] [was] the standard and it's still the standard practice in my office [,The Legal Aid Society].

*Id.* at 8:22–11:15.

Based on this testimony and the record, respondent conceded that if vindictive sentencing issue was properly presented to the Appellate Division, then it was also presented to the New York Court of Appeals. *Id.* at 11:22–25 (Respondent: "I just want to say, I said this in my brief, that if the claim was presented to the Appellate Division, I'm not contesting that it was exhausted by Ms. Martone's initial letter to the Court of Appeals . . . .").

The Epstein Letter of October 14, 1998 reflecting the offer of 20 years, *see supra* Section II(A)(2), was authenticated by Martone. During her representation of Garcia, he provided her with the letter. *Id.* at 22:3–14. Years later, Garcia requested its return. *Id.* Martone retrieved the case file and returned a full, correct copy of the letter to Garcia, with a covering letter dated December 2, 2009. *Id.* at 40:3–15; Ct. Ex. 1, Sept. 13, 2018 Hr'g.

### 2. Respondent's Evidence

Respondent requested time to submit evidence—though he claimed that an evidentiary hearing was not permissible. After an adjournment, the parties reconvened to complete the evidentiary hearing. The veracity of the Epstein Letter and petitioner's claim that a 20 year flat offer was made by the trial court was contested.

Respondent objected to the Epstein Letter on hearsay grounds. The court ruled that the document, which contains hearsay within hearsay, was admissible under the residual hearsay exception. *See* Fed. R. Evid. 807; Oct. 29, 2018 Hr'g Tr. 2:11–3:22. The statements had circumstantial guarantees of trustworthiness. It is a contemporaneous document reflecting advice of a stand-by lawyer to the equivalent of a client; and the other evidence, both oral and written, buttress its reliability as having been made contemporaneously by the now deceased stand-by lawyer based on what he was told by the trial judge, also now deceased. It is evidence of a material fact and it is more probative on the point offered that any other evidence that can be obtained (especially in light of the fact that both stand-by counsel and the trial judge have since passed away). Admitting the document into evidence will best serve the purposes of the rules in getting at the truth and the interests of justice, particularly in a habeas corpus proceeding. Fed. R. Civ. P. 1 (Rules "should be construed" to "secure the just" "determination"); Fed. R. Evid.

102 (Rules to be "construed" "to the end of ascertaining the truth and securing a just determination").

Respondent challenged the authenticity of the Epstein Letter and requested that petitioner produce the original copy of the letter. Petitioner submitted that he attached the original document to his letter to this court in support of his motion to amend his habeas petition in July 2003. *See* Oct. 29, 2018 Hr'g Tr. 12:9–12. He explained that the Clerk's Office did not have the original copy and that the original has been ordered from archives. (The letter, which previously not been viewable on the docket, is now available on the docket. *See* Ltr. from J. Pittell, ECF No. 140-1, Nov. 19, 2018.) Based on Ms. Martone's testimony, and the documentary evidence, a copy of the Epstein Letter was accepted by the court as the authenticated equivalent of the original. *See* Oct. 29, 2018 Hr'g Tr. 4:3–4, 14:19–25; Ct. Ex. 1, Oct. 29, 2018 Hr'g.

Several exhibits were admitted into evidence, including transcripts from two relevant hearings that took place contemporaneously to the writing of the Epstein Letter. *See infra* Section II(C)(2)(a). Ms. Rodriguez testified about her recollections of petitioner's case, the trial judge's reputation, and whether she recalled the trial judge making Garcia an offer of 20 years after the first trial.

a.     State Exhibits E–1 and E–2

On October 9, 1998, following the guilty verdict in the first trial, the trial judge excused the jury and requested Mr. Epstein (representing defendant for this purpose) to come up to the bench. After a sidebar discussion was held off the record, stand-by counsel told the trial court that Garcia is "going to be thinking it over." An excerpted transcript of this hearing was

introduced as State Exhibit E–1 at the evidentiary hearing.  The relevant exchange is set out

below:

> Trial Court:  Finally, I'd like to take this opportunity to wish all of you good health and good fortune for the rest of this coming year and the rest of the years. Thank you very much.  You are excused.
>
> (*Whereupon, the jury exits the courtroom.*)
>
> Trial Court: Mr. Garcia, do you wish to reserve your motions at this time?
>
> Defendant:  Yes.
>
> Trial Court:  What date?
>
> Defendant: Ten days, Judge?
>
> Trial Court:  Yes, ten days.
>
> Mr. Epstein:  It may take a little longer because I may want to have a defense presentence report from Osborne.
>
> Trial Court:  He doesn't have an attorney right now.  He's his own attorney.  Ten days.
>
> Clerk:  10/19, Monday?
>
> Mr. Epstein:  I can't make it the 19th.  Any day after that?
>
> Trial Court:  *Hold on. Come on up.*
>
> Mr. Epstein:  *Just me?*
>
> Trial Court: *Come up.*
>
> (*Whereupon, there was a side-bar discussion held off the record.*)
>
> Trial Court: *October 20.*
>
> Mr. Epstein:  *He's going to be thinking it over, Judge.*

Oct. 9, 1998 Hr'g Tr. at 248:16–249:19, State Ex. E–1, Oct. 25, 2018 Hr'g (emphasis added).

Eleven days later, at a hearing on October 20, 1998, petitioner requested an adjournment to "think about the plea offer." The trial court responded that he "[did] not think there was a plea offer, but certainly it was left open." The transcript of the hearing was introduced as State Exhibit E–2. The pertinent exchange is set out below:

Mr. Epstein: If I can have one moment.

Trial Court: Go ahead.

Mr. Epstein: Mr. Garcia would like to me make an application for him before we go to sentencing.

Trial Court: He has to make these applications. He is his own lawyer. What is your application?

Defendant: *An adjournment to think about the plea offer.*

Trial Court: *I don't think there was a plea offer, but certainly it was left open, the question of the outstanding indictments and whether you were interested in taking a plea to them.* You had since October 9. So you have had ten days to think about it. In fact, you had enough time to think about it at the time when you went to trial. So there's plenty of time and you took the time to write this motion and consequently that's denied. If you are interested in taking a plea to these other charges, that's okay, but I am not putting it over. What is your desire, Mr. Garcia? What do you wish to do?

Defendant: I am going to trial with the rest of the cases.

Court: Fine. That's okay. That's your right.

Oct. 20, 1998 Hr'g Tr. at 11:21–12:24, State Ex. E–2, Oct. 25, 2018 Hr'g (emphasis added).

> b. Deanna Rodriguez

Ms. Rodriguez, the Assistant District Attorney who prosecuted defendant in this case, testified that the trial court never made Garcia an offer of 20 years after the first trial.

Q And I want to now direct your attention to October 20, 1998. What was supposed to happen that day?

A [Garcia] was supposed to be sentenced. . . .

Q And when you first got to court and you expected to have a sentence, are you saying that that's not what happened?

A As best as I can remember, that didn't happen on that day.

Q. Well, did Mr. Garcia file a –

A -- a 330 motion. . . .

Q Ms. Rodriguez, is a 330 motion a motion to set aside a verdict before sentence?

A I think it is, yes.

Q And in this case, the defendant raised it [by] motion?

A Yeah. *He was very good at wasting time and money. . . .*

Q I want to direct your attention to page 12 of State's Exhibit E-2. . . . *At that time, does the defendant ask for an adjournment to consider the plea offer*?

A *No. There was no plea offer.*

Q Okay. Right. There was no plea offer. But on October 20th, on page 12, does the defendant request an adjournment to think about the plea offer? . . .

COURT: I do not know what she is going to say beyond the transcript.

Q Okay. . . . *On October 20th, 1998, was there a plea offer?*

A *No.*

Q *Not even by the judge?*

A *No, because he -- Mr. Garcia indicated that it was his intention to go to trial on all the charges.*

Oct. 25, 2018 Hr'g Tr. 13:16–19:15, ECF No. 137 (emphasis added).

She was asked about the off the record discussion that took place following the guilty verdict in the first trial. She testified that Garcia did not come up to the bench during this particular sidebar.

Q I would like to direct your attention to this case, *People vs. David Garcia*. In this case in 1998 -- I want to direct your attention to October 9, 1998. In that case, *People vs. David Garcia*, did you receive a verdict?

A Yes.

Q And what was the verdict, if you recall? And if you don't remember anything, you just let me know.

A The verdict on all counts was guilty. . . .

Q And who was the defense attorney in that case?

A Well, David Garcia represented himself, but Mr. Epstein was his legal advisor.

Q And prior to Mr. Epstein being David Garcia's legal advisor at that trial, what was Mr. Epstein's role?

A Well, he was the attorney and he was the second attorney that Mr. Garcia didn't like so he decided he would represent himself.

Q So after the verdict came down, the jury found the defendant guilty of the two counts, attempted murder in the second degree and robbery in the first degree, what, if anything, happened on that date? . . .

A Well, he was -- we saw the jury, and after that, he was sentenced.

Q Okay. So before we get to the sentence, after the verdict, was there discussion of having a sentence date?

A I'm sure there was. . . .

Q And when you were trying to schedule the sentence date, *did there come a time that [the trial court] asked the lawyers to step up to the bench*?

A *Yes, he did*.

Q *Who stepped up to the bench*?

A *Mr. Epstein and myself*.

Q *Not Mr. Garcia*?

A *No*.

*Id.* at 10:3–12:2 (emphasis added).

Ms. Rodriguez noted that it was the trial court's practice to try to get a defendant to plead out to any remaining charges following a conviction. But, she maintained that the trial judge did not offer Garcia a specific number of years during the private off the record discussion that was held at the end of the first trial.

> Q And at the bench, was there a discussion, obviously about the schedule, and anything else?
>
> A *Well, Mr. Garcia had multiple indictments, and it was [the trial judge]'s practice to, once the defendant was convicted on indictment one, let's say, he would look to plead out the remaining indictments.*
>
> Q So are you saying that even after this guilty verdict, the defendant had other charges that the District Attorney's Office had yet to try him on?
>
> A Correct.
>
> Q *And during this discussion about the charges that had yet to be tried, what, if anything, was said?*
>
> A *Well, there really wasn't much said. There was no number that [the trial judge] came up with. We were in a hurry --Mr. Epstein and I -- to speak to the jury; and as a litigator, that's important.*
>
> Q *Before we get to speaking with the jury, you said that there was no number. [The trial judge] did not offer a number*?
>
> A *No.*

*Id.* at 12:3–21 (emphasis added).

Ms. Rodriguez then testified about her recollections of the trial judge and reiterated that he never made the petitioner a 20 year flat plea offer. As the former Chief of the Gang Bureau for the Kings County District Attorney's Office, she had been in front of him on a number of occasions. She described him as a meticulous and by-the-book judge who did not permit ex-parte conversations.

The trustworthiness of these statements was undermined by her other testimony and the transcript from the October 9, 1998 hearing, which appears to reflect an ex-parte bench conference held by the trial judge.

> Q When we look at the sentence minutes of both sentences, [the trial judge] does not state a reason for sentencing the defendant to the sentence that he got. Was this unusual or surprising to you? . . .
>
> A No, it wasn't. . . . *I had practiced many years before [the trial judge], on top of which he was the senior judge for gang cases, so there were many times that he would even make me a part of the record over the phone, because he was very efficient at clearing his calendar in the form of pleas that were not -- you know, cases that were not taken to trial.*
>
> Q I want to direct your attention back to the first trial when this defendant went pro se. How did [the trial judge] treat Mr. Garcia?
>
> A He certainly treated him better than he treated me, you know.
>
> Q Did [the trial judge] ever call Mr. Garcia crazy?
>
> A No. That wasn't his way. *He was a judge that was a stickler for the rules. There was no ex parte conversations, nothing like that.* . . .
>
> Q *Throughout this whole trial, both the first and second trial, did [the trial judge] ever say that he was going to sentence the defendant to 20 years*?
>
> A *No.*
>
> Q And throughout this whole -- the first trial and second trial, did David Garcia ever give you or show you a letter that he supposedly got from Mr. Epstein?
>
> A No, he did not.
>
> Q You touched upon it earlier. *What was [the trial judge]'s policy on ex parte conversations*?
>
> A *He didn't have them. He felt -- as I told you, there were times that I was on the record and I was on the phone because he had wanted to discuss a particular case and everybody was there. He didn't have or entertain ex parte conversations.*
>
> Q And how often would you have to appear before [the trial judge]?

A Oh, my gosh. I can't even count. I had been -- it would be dozens of times a week.

Q And why did you appear before him so often?

A Because the gang cases mandated it, and if my other assistants were busy elsewhere, I would do the calendar because it was expedient.

Q And the calendar was done before which judge?

A Well, [the trial judge] was one of them, and there were four other judges.

Q So [the trial judge] got the gang cases?

A Oh, yeah, he did.

Q What was your position in the Gang Bureau at the time?

A I was the chief.

*Id.* at Hr'g Tr. 29:13–31:21 (emphasis added).

On cross-examination, Ms. Rodriguez testified it was the trial judge's practice to excuse the jury and have the parties argue from the table—and not up at the bench— when holding bench conferences. She stated that while it was Mr. Epstein who mostly handled the defense's legal arguments, Garcia would have been able to hear everything said in these discussions from the table.

Q *And at any point during the first trial, was there ever cause to have a -- there to be a bench conference where a discussion was held off the record that you can recall?*

A *If there was, [the trial judge] would remove the jury; and what I recall is that those discussions were had on the record with the remaining people in the courtroom.*

Q Okay. And so Mr. Garcia was permitted to -- well, Mr. Garcia took part in those discussions?

A No, I don't believe so.

Q So even though he wasn't a lawyer on the case, he was not permitted to be part of those discussions --

A I didn't say he was not permitted. I'm saying that I don't recall him making any legal, you know, or strategic arguments. . . .

Q You said sometimes the jury would be sent out, and there would be discussions with the judge with the lawyers, including you; is that correct?

A That's correct.

Q *And so Mr. Garcia was present during those discussions.*

A *Yes, he was. But don't forget, counsel, he was a defendant who was a violent defendant, and those things had to be considered, and the jury was sent out so as not to prejudice Mr. Garcia. . . .*

Q At any point during the trial, were there ever occasions where you had discussions with [the trial judge] when the jury was not present?

A I'm sure there were. I don't remember.

Q And Mr. Garcia would have been present during those conversations.

A Yeah, I'm sure he was.

Q Because otherwise it would have been an ex parte conversation --

A That's correct.

Q -- between you and [the trial judge].

A Right. And that didn't happen.

Q So because since Mr. Garcia was counsel, then he would be required to be present with any conversations between you and [the trial judge].

A That would be true.

Q Because otherwise that would be a violation of [the trial judge]'s policy.

A No. Actually that would be a violation of the U.S. Constitution. I mean, the bottom line is, [the trial judge] was a proper judge in ensuring that the law was followed; and he -- he would make sure that someone like Mr. Garcia, who represented themselves, had whatever opportunity he needed to express himself on the record.

Q *So it would be improper if [the trial judge] had a conversation with you at any point during the proceedings relating to the trial where Mr. Garcia was not present.*

A *He was present, but he wasn't up at the bench. Again, this is a man who robbed people and establishments with a loaded gun.*

COURT: Excuse me. There were occasions, you say, when in the courtroom, you and the judge were conferring on a legal issue, but no lawyer, including the petitioner for himself --

WITNESS: Yeah.

COURT: -- was there? Listen. Consider that carefully. That is an ex parte; is it not?

WITNESS: No, because a legal issue would come up, I would make my argument, and in those instances, I believe it was Epstein who made the legal argument on behalf of Mr. Garcia.

COURT: Ma'am, Garcia was not up when Epstein was next to you making an argument on legal issues . . . on some occasions?

WITNESS: Well, what do you mean by "up" here?

COURT: Next to the judge at the bench.

WITNESS: No, but he heard everything because in this case --

COURT: I didn't ask you. Was there any occasion when the judge was on the bench and you were arguing with the judge when, in this case, the defendant was not up there with you?

WITNESS: There was not a time I recall that Mr. Garcia was not privy to what we were --

COURT: That is not the question.

WITNESS: Judge, then I can't answer your question.

COURT: Excuse me. I'm talking about the physical situation. Do you understand?

WITNESS: No, I don't.

COURT: The judge was on the bench, correct?

WITNESS: Correct.

COURT: You were standing in front of the bench, correct?

WITNESS: Not in this case. That's what I'm trying to tell you.

COURT: *Where were you arguing from?*

WITNESS: *We were arguing at our tables, and Mr. Garcia was present there. Because he was acting as his own counsel, [the trial judge] did not have private conversations with me and Mr. Epstein.*

COURT: *You were at your table?*

WITNESS: *Yes.*

COURT: *Did you hear what the judge was saying?*

WITNESS: *Yes.*

COURT: *Epstein was at the defendant's table?*

WITNESS: *With the defendant, yes.*

COURT: *In your opinion, could he hear what the judge and you were saying?*

WITNESS: *Yes.*

COURT: *The defendant was present at the defendant's table.*

WITNESS: *Yes.*

COURT: *In your opinion, did the defendant hear everything that was said between or among you, Judge, and Mr. Epstein?*

WITNESS: *Yes.*

*Id.* at 35:8–40:5 (emphasis added).

Petitioner's counsel confronted the witness with the transcript from the October 9, 1998 hearing. Ms. Rodriguez offered inconsistent and conflicting statements in response to counsel's questions.

40

Q *Ms. Rodriguez, isn't it a fact that there was at least one instance where you had a sidebar conversation off the record with [the trial judge] where Mr. Garcia was not present? . . .*

A *No, that's not true.*

Q Ms. Rodriguez, the verdict was delivered in this case on October 9, 2018; is that your recollection?

A Yes. . . .

Q And you recall after the jury came out and rendered the verdict, the judge discharged the jury?

A Yes.

Q *And then after that, before you rushed out to go speak to the jury, you participated in a sidebar conversation with [the trial judge]; is that correct?*

A *No, that is not correct.*

Q No? All right. Did Mr. Epstein participate in a sidebar conversation with [the trial judge]?

A I don't understand your question. I mean, I don't recall there being a -- like I said, he wouldn't have had a conversation with either of us without everybody being present, so I don't understand your question.

Q So you're saying there would not have been a sidebar conversation without Mr. Garcia being present.

A That's correct. . . .

Q *On direct examination, you said that [the trial judge], after the verdict, had asked the lawyers to step up. Do you recall saying that?*

A *He didn't do that, no.*

Q *No, he didn't do that. Well, on direct examination, you talked about a conversation with [the trial judge] after the verdict.*

A *I don't know what you are getting at, counsel. Spit it out.*

Q You had said on direct examination that after you reached a verdict, that [the trial judge] asked the lawyers to step up, and there was a discussion at the bench.

A He didn't do that. He didn't do that in this case. . . .

Q All right. If you can turn to the first section, State Exhibit E-1, page 249. . . . Ms. Rodriguez, do you have page 249 in front of you?

A I see it, yes.

Q Do you see the first line, line 2 where it says, The clerk, where the clerk is saying, Ten days, Judge, and there's a question mark?

A Yeah.

Q Is that where the clerk is asking the judge to set a sentence date in ten days?

A Yes, I think so.

Q And then the next line, it says, The Court says yes, ten days. Does that mean the judge is saying, yes, set it in ten days?

A I believe so.

Q And then the next line, Mr. Epstein says, It may take a little longer because I want to have a defense Presentence Report from Osborne. Do you see that line?

A Yeah.

Q And then the next line it says: The Court: He doesn't have an attorney right now. He's his own attorney. Ten days. Do you see that line?

A Yes.

Q Those two lines. So that, I take it, is [the trial judge] saying that Mr. Garcia is his own attorney and that Mr. Epstein should not be asking for a longer adjournment date; is that correct?

A That's what it looks like.

Q *Okay. And then let's go down to line 12 where it says, The Court.*

A *Yeah.*

Q. *Just so we're clear, where it says, The Court, that's referring to* [*the trial judge*] *speaking. Do you see that?*

A. *Yes.*

Q *It says, Hold on. Come on up. And that means come on up to the bench.*

A *Yeah.*

Q *And then Mr. Epstein says, Just me? And then the court says, Come up. . . . So when [the trial judge] is saying come on up on line 12 and line 14, he's telling Mr. Epstein to come up to the bench; is that correct*?

A *That's what it looks like.*

Q *Okay. And then, in fact, line 15 and line 16 indicates there was a sidebar discussion held off the record; is that correct*?

A *That's what it says, yeah.*

Q And were you present for that sidebar discussion off the record?

A I don't recall, sir. . . .

Q Let's go back to page 248. . . . So at line 21, it says, Whereupon the jury exits the courtroom.

A Right. . . .

Q So the jury had left the courtroom. That's what that means when it says, Whereupon the jury exits the courtroom? It means what it says[?]

A Yeah.
Q So when [the trial judge] said on page 249, Come on up, the jury had already exited the courtroom.

A Yes.

Q So the sidebar discussion was held off the record without the jury being present.

A Well, the jury wasn't there.

Q *Right. So there was no need for Mr. Epstein to come up to the bench and have a sidebar conversation unless the judge wanted to say something to him that Mr. Garcia couldn't hear.*

A *I don't know.*

Q *So were you present during that sidebar discussion?*

A *As I said, my recollection is the sidebars were open so that everybody in the courtroom could hear what he was saying.*

Q I'm referring to this particular sidebar conversation reference on page 249 at line 15.

A And, again, I'm telling you that doesn't change.

Q If you could just let me finish my question, I would appreciate it. I'm referring to the sidebar discussion reference on page 249 at line 15, line 16. As you sit here now 20 years later, do you recall whether or not you were present during that sidebar conversation which took place?

A Again, everybody was.

Q Who is everybody?

A Everybody in the courtroom, sir.

Q You?

A Yeah.

Q Mr. Epstein?

A Yeah.

Q But not Mr. Garcia.

A Everybody in the courtroom including Mr. Garcia.

Q So it's your testimony that Mr. Garcia went up to the sidebar conversation.

A The sidebars weren't conducted that way. I've said that a million times.

Q As you sit here now, is it your recollection that this sidebar conversation was held off the record with you, Mr. Garcia, and Mr. Epstein?

A Listen, what I've said is that all sidebars were not done in private with the attorneys. Everybody who was in the courtroom heard it, so I don't know what it is that you are saying.

Q So what's the point of asking him to come up if the jury is not in the courtroom?

A I don't know. You would have to ask [the trial judge], but you can't.

Q *The purpose of asking someone to come up to the sidebar is so that everybody in the courtroom cannot hear what is discussed. Isn't that the purpose of a sidebar conference?*

A *That could be. . . .*

Q *So just so we're clear, as you sit here now 20 years later, do you recall the sidebar conversation which occurred as referenced on page 249, line 15 and line 16?*

A *I don't know. I don't recall.*

Q *As you sit here now, you can't say what was actually discussed during that sidebar conversation referenced on page 249 in the transcript.*

A *I guess not.*

Q *Okay. So if a discussion of 20 years' sentence was made during that conversation, you can't recall that.*

A *Oh, that's what you're getting at, okay. . . .*

Q So since you cannot recall what occurred during that sidebar conversation on page 249, you cannot recall whether or not a sentence of 20 years was discussed during that sidebar.

A I don't believe that's an accurate question, sir, I'm sorry.

COURT: Excuse me. . . .

WITNESS: -- [The trial judge] wouldn't have done that.

COURT: Excuse me. Do you recall what was said at the sidebar?

WITNESS: You know what, I don't know. Whatever. If you are interested in justice, I'm telling you --

COURT: Excuse me. . . .

WITNESS: What is it you want me to look at, Judge?

COURT: *Page 15 says -- and this is the reporter -- whereupon there was a sidebar discussion held off the record. That is right, isn't it?*

WITNESS: *That's what's written there, yes.*

COURT: *And is that an accurate description of what happened? . . . If you don't recall, say so.*

WITNESS: *I don't recall.*

COURT: Okay. Then the Court said, October 20th. What [does he] mean by October 20th?

WITNESS: That was the date of adjournment.

COURT: Good. Thank you. *And then Mr. Epstein says, He's going to be thinking it over, Judge.*

WITNESS: *Yes, that's there.*

COURT: *Did he do that, if you recall?*

WITNESS: *I don't recall that, but I'm sure he did.*

COURT: *Answer my question. Do you recall it?*

WITNESS: *No.*

*Id.* at 40:16–52:3 (emphasis added).

Regarding the October 20, 1998 hearing where petitioner requests an adjournment to "think about the plea offer," the witness testified that she did not make the defendant a plea offer following the first trial.

Q  If we could take a look at the October 20th transcript[.] . . .  if you could look at page 12, line 5 and line 6 where it says, The defendant -- I take it that's referring to Mr. Garcia. . . . That's a statement by Mr. Garcia[?]

A Yes, it is.

Q And so he's mentioning a plea offer. So he's not referring to any plea offer that you made, because you hadn't made a plea offer.

A Neither did the Court.

Q That's not my question. *My question is, you did not make a plea offer*.

A *And I answered that. No, I did not*.

*Id.* at 54:4–55:3 (emphasis added).  She added additional testimony on re-direct.

Q Ms. Rodriguez, going back to the minutes that [petitioner's counsel] was referring to, October 20, 1998, page 12, *he asked you about lines 5 and 6 where the defendant states in court, An adjournment to think about the plea offer*.

A *That's correct*.

Q *Was there a plea offer at the time*?

A *No*.

Q *And the judge, in response to the defendant's request for an adjournment to think about the plea offer, isn't it true that the judge said, I don't think there's a plea offer*?

A *That's correct*.

Q *But what was left open was for the fact for the defendant to think about pleading guilty to the counts that had yet to be tried, correct*?

A *Correct*.

Q So going back to the verdict date, which is the first section of State's Exhibit E, which is page 249 --

A Yes.

Q -- when Mr. -- and this is lines 18 and 19. *After there was a bench conference and Mr. Epstein puts on the record he's going to be thinking about it over, Judge, obviously that was a discussion that was had with the Court and, obviously, you know, with the parties, you, correct*?

PETITIONER'S COUNSEL: Objection to the form.

COURT: I will allow it. If you can recall exactly.

WITNESS: *Honestly, I don't recall, Your Honor. . . .*

Q Going to the verdict date, after the jury returned a guilty verdict, when we look at the minutes, the judge asks for a -- for the attorneys -- for -- it says to come up, and Mr. Epstein says, Just me? And [the trial judge] says, Come up. *And were you at that -- were you part of that discussion too?*

COURT: *Excuse me. I want you now to direct your attention to what you recollect, not what you infer from general practice or from this record.*

WITNESS: *I don't recall, Your Honor. . . .*

Q Ms. Rodriguez, you said that [the trial judge] at no time offered the defendant 20 years. Why do --

A As far as -- as far as I knew.

Q Why do you say that? . . .

A: This was a case that had multiple robberies in the first degree; there was very serious; and because of that, [the trial judge] was a stickler at making sure that everything was covered properly.

Q *During the course of the first trial, the second trial, the suppression hearing, any of the adjournments, had you ever heard [the trial judge] say that he was offering this defendant 20 years? . . .*

A *No.*

COURT: *That is your flat recollection*[?]

WITNESS: *That's my recollection, Your Honor.*

*Id.* at 56:22–61:10 (emphasis added).

### 3. Findings of Fact

The court finds by clear and convincing evidence that the Epstein Letter in this federal court's records is genuine and reflects an offer from the sentencing judge of 20 years incarceration, flat on all counts concurrent, in exchange for a plea of guilty to all charges on all robberies. The contemporaneous record, and subsequent litigation show this to be true.

The Epstein Letter was authenticated by Katheryn Martone, Garcia's lawyer on direct appeal. *See supra* Section II(C)(1). She was a credible witness.

The court does not rely on the testimony of Deanna Rodriguez, the lead prosecutor at petitioner's trials and sentencings. *See supra* Section II(C)(2)(b). Ms. Rodriguez was not a

credible witness. She provided inconsistent and unreliable testimony regarding her recollections of the trial judge and petitioner's case. The witness was openly hostile, frequently appearing agitated and confused.

The record demonstrates that the trial court conveyed a flat 20 year offer to the defendant through his stand-by counsel after the first trial had ended. An ex-parte off the record conversation took place without the petitioner on October 9, 1998, following the defendant's guilty verdict. The trial judge excused the jury and invited Epstein (acting as stand-by counsel), and not the petitioner (acting as his own attorney), to come up to the bench. Following this sidebar, stand-by counsel told the trial judge that the defendant "will be thinking it over"— highly probably referring to a plea offer made by the trial court during the ex-parte bench conference.

The trial court's 20 year flat offer was memorialized in writing five days later on October 14, 1998 in the Epstein Letter. The letter—which reflects stand-by counsel, having heard the judge's offer, urging, in effect, his client to accept a plea or risk dying in prison—contains circumstantial guarantees of trustworthiness. Then on October 20, 1998, at a hearing on petitioner's 330 motion, Garcia asked the trial court for an adjournment of sentencing to "think about the plea offer." (The trial judge's response—that he "[did] not think there was a plea offer"—is inexplicable and is given no weight.)

Garcia discussed the letter and its contents at his first sentencing hearing. He stated:

> Your Honor, *I have a letter here with Mr. Epstein's own stationery, a true letter which he wrote me just after the jury verdict* and I am not going to go into every specific detail of his letter. It is highlighted down here and he says, "Otherwise, to put it harshly, you will surely never walk out of prison again." And he also said since the judge, if the judge sees the facts he will sentence you to more than *20 years*, since the judge is in due defiance.

Oct. 26, 1998 Sent. Hr'g Tr. at 8:23–9:9 (emphasis added).

Neither the State judge, prosecutor, nor Mr. Epstein clearly disputed the fact that an offer of twenty years had been made by the State trial judge following Garcia's remarks; it is found to be true by clear and convincing evidence. Epstein stated that Garcia was in "great jeopardy" unless he took a plea. *Id*. at 10:7–15. He continued:

> I hand delivered him a letter so he would be clear on what he faces and what the consequences are and *what his options are*. I did say that he should plead guilty. And I made it very clear to him that he will probably face less time, a good chance if he plead guilty to everything on this case than if he went forward to sentencing in this case, and I think it was my obligation as his attorney to let him know that and I stand by what I told him.

*Id.* at 10:16–25 (emphasis added).

A decade later, in a 2009 State court motion, the authenticity of the letter and offer were again corroborated by the sentencing judge. Defendant moved in the State court to vacate his sentence, arguing that Epstein was ineffective because of his failure to convince Garcia to accept the plea offer of 20 years. *See* David Garcia's Affidavit In Support in Of CPL§ 440.10, ECF No. 130, Ex. C, Jan. 23, 2009. The sentencing judge's initial ruling on the motion cast doubt on Garcia's account of the plea offer:

> Finally, even if this court were to consider a claim of ineffective assistance of counsel predicated upon the advice of standby counsel, who was appointed only to assist a self-representing defendant at his criminal trial, this particular claim is factually based solely upon the *unsupported allegations* of the defendant, which facts appear to be contradicted by the record. See CPL§ 440.30(b), (d). Defendant asserts that the plea offer was conveyed to him in a letter by counsel, which the record supports, as this letter was discussed by both defendant and counsel during the sentence proceeding.
>
> However, defendant's assertion that the offer was a single sentence of twenty-years to cover both the two crimes for which defendant was convicted at the first trial and all of the open counts on the three robberies for which defendant had not yet been tried is completely unsubstantiated as defendant *has not submitted the letter to the court.* Moreover, as standby counsel described the letter on the record as advising defendant that he would likely receive a lesser sentence if he pled guilty to the three robbers than he would if he proceeded to trial on them, *it is not likely that the letter actually contained an offer by the court of a specific sentence.*

Decision & Order on 440.10 Motion, ECF No. 130, Ex C, May 19, 2009 (emphasis added).

In response to the sentencing court's ruling, Garcia filed an addendum to his motion annexing the Epstein Letter. *See* Addendum to 440.10 Motion, ECF No. 130, Ex D, Dec. 11, 2009. The court then issued an amended order:

> The ineffective assistance claim [,that Epstein should have convinced Garcia to accept the plea offer,] is also rejected because it is made solely by the defendant and is refuted by the trial record and by *the letter sent to the defendant to counsel conveying the court's plea offer.* Both *the court* and standby counsel *unequivocally informed the defendant that he was facing an extremely long sentence if convicted of all four robbery incidents after trial.*

Decision & Order on 440.10 Motion, ECF No. 130, Ex. D, June 29, 2010. (emphasis added).

Based on the contemporaneous record, Ms. Martone's testimony, and the subsequent statement of the trial judge, it is found as a matter of fact that the twenty year flat offer was made by the State trial judge, conditioned on the defendant not going to a further trial, and it was accurately conveyed to Garcia through the Epstein Letter. In this court's view, a State court's finding, were an evidentiary hearing conducted in the State, would be the same as this court's— on the evidence on the full record. *See infra* Section V; *but see* 28 U.S.C. §§ 2254(d)–(e) (presumption of correctness of State court findings on evidence relevant to habeas corpus hearing).

III. Law

A. Source of Authority for Review of Motion

1. Successive Habeas Petitions

The availability of a successive habeas petition is limited. "A claim presented in a second or successive habeas corpus application under [28 U.S.C. §] 2254 that was presented in a prior application shall be dismissed." 28 U.S.C. § 2244(b)(1); *see also id.* § 2244(b)(3)(A)

(order from court of appeals needed for a "second or successive application").  If a successive

habeas petition raises a new claim, it must be dismissed unless:

> (A) the applicant shows that the claim relies on a *new rule of constitutional law*, made
> retroactive to cases on collateral review by the Supreme Court, that was previously
> unavailable; or
> (B)(i) the factual predicate for the claim *could not have been discovered previously*
> through the exercise of due diligence; and
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a
> whole, would be sufficient to establish by clear and convincing evidence that, but for
> constitutional error, *no reasonable factfinder would have found the applicant guilty of the
> underlying offense*.

*Id.* § 2244(b)(2) (emphasis added).  Based on § 2244, there is a serious question whether the

Court of Appeals for the Second Circuit would approve a second petition in the instant case.

### 2.   Rule 60(b) Motions

Rule 60(b) of the Federal Rules of Civil Procedure provides a method to redress a

mistake in the district court on a motion for a writ of habeas corpus.  It is not a second petition

for the writ.  The rule reads:

> On motion and just terms, the [district] court may relieve a party or
> its legal representative from a final judgment, order, or proceeding
> for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that, with reasonable diligence,
> could not have been discovered in time to move for a new trial
> under Rule 59(b);
> (3) fraud (whether previously called intrinsic or extrinsic),
> misrepresentation, or misconduct by an opposing party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released, or discharged; it is
> based on an earlier judgment that has been reversed or vacated;
> or applying it prospectively is no longer equitable; or
> (6) *any other reason that justifies relief*.

Fed. R. Civ. P. 60(b) (emphasis added).

A motion filed pursuant to Rule 60(b) for one of the first three enumerated reasons must be filed "no more than a year after the entry of the judgment or order or the date of the proceeding." *Id.* 60(c)(1). For all other reasons, including the catch-all of subsection six ("any other reason that justifies relief"), a Rule 60(b) motion must be filed "within a reasonable time." *Id.*

The Court of Appeals for the Second Circuit has ruled that Rule 60(b) "confers broad discretion on the trial court to grant relief when appropriate to accomplish justice [and] constitutes a grand reservoir of equitable power to do justice in a particular case." *Pichardo v. Ashcroft*, 374 F.3d 46, 55 (2d Cir. 2004) (quoting *Matarese v. Le Fevre*, 801 F.2d 98, 106 (2d Cir. 1986) (quotation marks omitted)). The district court must seek "a balance between serving the ends of justice and preserving the finality of judgments." *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986); *Rodriguez v. Keane*, 2003 WL 21673624, at *1 (S.D.N.Y. July 16, 2003). Granting a Rule 60(b) motion requires a showing of "extraordinary circumstances" to "justify[] the reopening of a final judgment." *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005) (citations and quotation marks omitted); *see also Mendell in Behalf of Viacom, Inc. v. Gollust*, 909 F.2d 724, 731 (2d Cir. 1990), *aff'd sub nom. Gollust v. Mendell,* 501 U.S. 115 (1991) (finding that relief under Rule 60(b) may be granted "only upon a showing of exceptional circumstances").

3. Distinguishing Between Successive Rule 60(b) Motions and Successive Habeas Corpus Petitions

In *Gonzalez v. Crosby*, the Supreme Court addressed "whether a Rule 60(b) motion filed by a habeas petitioner is a 'habeas corpus application' as [AEDPA] uses that term." 545 U.S. at 530. The Court held that labeling an application as one for Rule 60(b) relief, rather than a successive petition, is not controlling: "Using Rule 60(b) to present *new claims* for relief from a state court's judgment of conviction . . . circumvents AEDPA[]." *Id*. at 531. A Rule 60(b)

motion that seeks to bring a new claim or "attacks the federal court's previous resolution of a claim *on the merits*" should be treated as a successive habeas application. *Id*. at 532 (emphasis in original).

The *Gonzalez* Court, nevertheless, wrote that not all Rule 60(b) motions brought by habeas petitioners should be treated as successive petitions for the writ. "When no 'claim' is presented, there is no basis for contending that the Rule 60(b) motion should be treated like a habeas corpus application." *Id*. at 533. Relying on this distinction, the Court held that a motion claiming that "federal courts misapplied the federal statute of limitations" was properly heard as a motion under Rule 60(b). *Id*.

### 4. Residual Writ of Habeas Corpus

The United States Constitution provides: "The Privilege of the Writ of Habeas Corpus *shall not be suspended*, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2 (emphasis added). The Supreme Court has held that AEDPA's restrictions on successive habeas petitions do not violate the Suspension Clause. *See Felker v. Turpin*, 518 U.S. 651, 664 (1996) ("The added restrictions which [AEDPA] places on second habeas petitions . . . do not amount to a 'suspension' of the writ contrary to Article I, § 9."). The constitutional clause itself implicitly recognizes that availability of the writ is a substantive right predating the founding of the United States and serving to protect liberty.

Present procedural rules governing the writ of habeas corpus effectively limit the substantive right. The core of a habeas proceeding is a continuing constitutional violation—"the *right not to be held in custody in violation of the Constitution*." *Crater v. Galaza*, 508 F.3d 1261, 1269 (9th Cir. 2007) (Reinhardt, J., dissenting from the denial of rehearing *en banc*) (emphasis in original). Taken to its extreme, a general prohibition on successive habeas petitions

except on the narrowest of grounds—or under AEDPA—could allow indefinite detention of a prisoner who was convicted and is being held in clear contravention of the United States Constitution.

In limited circumstances, the Supreme Court has eschewed the harsh application of procedural rules that would result in a "fundamental miscarriage of justice." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief."). "The miscarriage of justice exception . . . survived AEDPA's passage." *Id*. at 393.

"[T]he Supreme Court has rejected a rigid construction of AEDPA under which a habeas petitioner would be entitled to only one decision on the merits, and thereafter would be subject to AEDPA's gatekeeping provisions *in all cases* regardless of whether the petitioner could have raised his current claims in the first petition." *Villanueva v. United States*, 346 F.3d 55, 61 (2d Cir. 2003) (emphasis added).

Inflexible application of successive petition rules can be dispensed with where the "implications for habeas practice would be far reaching and seemingly perverse." *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644 (1998). In *Stewart*, the Supreme Court held that the petitioner was entitled to review of his claim in the first instance by the district court, even though the claim had been previously reviewed and rejected by the federal courts as premature. The Court explained: "[t]his may have been the second time that respondent had asked the federal courts to provide relief on his [] claim, but this does not mean that there were two separate applications, the second of which was necessarily subject to § 2244(b)." *Id*. at 643. The source of authority for the Supreme Court's rulings is unclear. *Cf. McQuiggin*, 569 U.S. at 401–

02 (Scalia, J., dissenting) ("What is the source of the Court's power to fashion what it concedes is an 'exception' to this clear statutory command?").

The thrust of the Supreme Court's rulings and the Suspension Clause itself suggest that there is a residual right to the writ of habeas corpus that may, in exceptional cases, operate outside the Congressional limits on authority when necessary to prevent an injustice.  *Cf.* The Federalist No. 84 (Alexander Hamilton) (referring to the writ of habeas corpus as the "the BULWARK of the British constitution" (emphasis in original)); *but cf. Ex parte Bollman*, 8 U.S. 75, 93–94 (1807) ("[F]or the meaning of the term habeas corpus, resort may unquestionably be had to the common law; but the power to award the writ by any of the courts of the United States, must be given by *written law*." (emphasis added)).

A *written right* to habeas relief, commentators have argued, was created by the Fourteenth Amendment.  *See* Jordan Steiker, *Incorporating the Suspension Clause: Is There A Constitutional Right to Federal Habeas Corpus for State Prisoners?*, 92 Mich. L. Rev. 862 (1994).  "When the Thirty-ninth Congress drafted the Fourteenth Amendment, the writ of habeas corpus had a significant history in this country independent of its English origins."  *Id.* at 870. This history and the Supreme Court's later incorporation doctrine suggest that "the Suspension Clause, viewed through the lens of the Fourteenth Amendment, affords state prisoners a constitutional right to federal review of constitutional claims in the lower federal courts."  *Id.* at 911; *cf.* Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences*, 113 Mich. L. Rev. 1219 (2015).

The residual right to habeas review of a state conviction provides, at least in some exceptional instances, a path to federal oversight of a state conviction where a miscarriage of justice has occurred. The extreme vindictiveness in the present case can be construed as exceptional enough to support an application for a writ of habeas corpus in the federal court.

### B.  Exhaustion of State Remedies

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254 (b)(1)(A). To exhaust, a petitioner must have sought review in the State's highest court with jurisdiction and "fairly presented" the federal constitutional claim to the State courts, including the highest court of the State. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

"The state court may be alerted to constitutional claims by reliance on federal and state cases employing constitutional analysis, asserting particulars that highlight a constitutional right, or alleging facts within the mainstream of constitutional litigation." *Abdurrahman v. Henderson*, 897 F.2d 71, 73 (2d Cir. 1990) (internal quotation marks omitted). "Adherence to exhaustion principles does not require a petitioner to raise his claims 'by citing chapter and verse' of hornbook law; it simply mandates that the state be given fair opportunity to hear the claim." *Id*.

The Court of Appeals for the Second Circuit has recognized several ways that the requirement of State exhaustion can be met:

(a)  reliance on pertinent federal cases employing constitutional analysis,

(b)  reliance on state cases employing constitutional analysis in like fact situations,

(c)  assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and

(d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Jimenez v. Walker*, 458 F.3d 130, 149 n.21 (2d Cir. 2006) (citing *Daye v. Attorney Gen. of State of N.Y.*, 696 F.2d 186, 194 (2d Cir. 1982)).

Exhaustion requires the petitioner to have presented in the State court "both the *factual* and the *legal premises* of the claim he asserts in federal court." *Daye*, 696 F.2d at 191 (emphasis added). To meet the exhaustion requirement with respect to the claim's factual premise, the Court of Appeals for the Second Circuit in *Davidson v. Keane* explained:

> The crux of the issue is whether [petitioner's] proffer of additional information in his federal petition merely supplements the claim presented to the state court, or whether it fundamentally alters the claim. Important factual allegations that are added for the first time to [a] claim on federal habeas appeal can result in the claim being dismissed for nonexhaustion. To reach the merits of an [federal habeas] claim, all of the allegations must have been presented to the state courts, allowing them the opportunity to consider all the circumstances and cumulative effect of the claims as a whole. . . . Specifically, the petitioner must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim.

107 F.3d 2, *1 (2d Cir. 1997) (citations and internal quotation marks omitted).

1. New York State Court Sentencing Jurisdiction and Avenues of Review

A nuanced understanding of the sentencing jurisdiction of the New York Court of Appeals is necessary to appreciate the presentment of federal sentencing issues before that court. The leading commentators on the New York Court of Appeals power explained:

> An intermediate appellate court is authorized, on an appeal by a defendant from a judgment of conviction or a sentence, to review, not only the legality of the sentence, but also whether the sentence is "unduly harsh or severe." If it determines that the sentence is within that category, it is empowered, as a matter of discretion in the interest of justice, to reduce the sentence to a legally authorized lesser sentence or to reverse and remit the case to the court below for resentencing.

> In contrast, the jurisdiction of the Court of Appeals in relation to the sentence is limited to the review of questions of law affecting the sentence. It has no discretion

to reduce a lawfully imposed sentence on the ground of its being unduly harsh or severe, and it has no power to overturn an intermediate appellate court's exercise of discretion in granting or refusing a reduction of sentence on that ground.

Henry Cohen & Arthur Karger, *The Powers of the NY Court of Appeals* § 21:8 (2018).

The intermediate appellate courts in New York, the Appellate Divisions of the Supreme Court, have powers to modify or reduce a sentence that the highest court, the New York Court of Appeals, lacks. *See People v. Discala*, 45 N.Y.2d 38, 44 (1978) ("Finally, contrary to defendant's assertion, it is the Appellate Division, and not [the New York Court of Appeals], which is authorized to reduce a sentence in the exercise of its discretion and in the interest of justice."); *People v. Thompson*, 60 N.Y.2d 513, 520 (1983) ("The power of the Appellate Division to reduce a sentence, which it finds unduly harsh or severe, in the interest of justice and impose a lesser one has long been recognized in this State.").

The difference in powers between the Appellate Divisions and the New York Court of Appeals can lead to circumstances in which a sentencing claim, based upon justice rather than legality, may be raised before the Appellate Division that is not then appealable to the New York Court of Appeals. By contrast, arguing before the Appellate Division that a sentence is unconstitutional gives the New York Court of Appeals the power to review that claim. Henry Cohen & Arthur Karger, *supra*, § 21:8.

The Appellate Division may use its statutory authority to modify a sentence because it was illegally imposed—i.e., in violation of the federal constitution.

> [T]he intermediate appellate court must either affirm or reverse or modify the criminal court judgment, sentence or order. The ways in which it may modify a judgment include . . .
>
> (c) Upon a determination that a sentence imposed upon a valid conviction is illegal or unduly harsh or severe, the court may modify the judgment by reversing it with respect to the sentence and by otherwise affirming it.

3. A reversal or a modification of a judgment, sentence or order must be based upon a determination made:
(a) Upon the law; or
(b) Upon the facts; or
(c) As a matter of discretion in the interest of justice; or
(d) Upon any two or all three of the bases specified in paragraphs (a), (b) and (c).

*The kinds of determinations of reversal or modification deemed to be upon the law include, but are not limited to, the following*:
(c) That a sentence was unauthorized, *illegally imposed or otherwise invalid as a matter of law.*

N.Y. Crim. Proc. Law § 470.15 (McKinney) (emphasis added).

The two separate jurisdictional powers of the Appellate Division present a problem for the appellate lawyer who wants to stress the interest of justice argument, in view of a sentence so much longer than a defendant's expected life, but yet does not want to concede the constitutional issue. This is particularly true in a case, like the instant one, where the constitutional claim may include a serious criticism of a distinguished trial judge. A prudent appellate lawyer might well have focused her argument on the justice claim, rather than a constitutional claim such as judicial vindictiveness, to avoid unnecessarily disparaging a trial judge, while, at the same time, making both claims.

2.      New York Court of Appeals Presentment

Presentment requires a federal constitutional issue to be raised in an application for discretionary review before New York State's highest court. *See O'Sullivan*, 526 U.S. at 848–49. In New York, this requires a defendant to "first appeal his or her conviction to the Appellate Division, and then [] seek further review of that conviction by applying to the [New York] Court of Appeals for a certificate granting leave to appeal." *Galdamez v. Keane,* 394 F.3d 68, 74 (2d Cir. 2005).

A line has been drawn by the Court of Appeals for the Second Circuit, based in part on the volume of the application, to determine when a claim is fairly presented. When a substantial application for leave is filed before the New York Court of Appeals, more than passing reference must be made to the question of federal law raised on habeas review. The Court of Appeals for the Second Circuit has "declined to hold that New York's highest court has a duty to look for a needle in a paper haystack." *Id.* (internal quotations omitted).

*Jordan v. Lefevre* illustrates this principle:

> In this case, Jordan forcefully argued his *Batson* claim in the first three paragraphs of his application for leave, but made no reference to his other claims. In the fourth paragraph of his counsel's letter to the New York Court of Appeals he asked that he be given permission to appeal "[f]or all of these reasons and the reasons set forth in his Appellate Division briefs." *Arguing a single claim at length and making only passing reference to possible other claims to be found in the attached briefs does not fairly apprise the State court of those remaining claims. See Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991). We conclude, as did the district court, that arguing one claim in his letter while attaching an appellate brief without explicitly alerting the State court to each claim raised does not fairly present such claims for purposes of the exhaustion requirement underlying federal habeas jurisdiction. Petitioner's counsel has the obligation to set out these arguments. Counsel may not transfer to the State courts the duty to comb through an applicant's appellate brief to seek and find arguments not expressly pointed out in the application for leave. Had appellant more clearly Stated that he was pressing all of the claims raised in the attached brief, or had his letter made no argument in detail but rather only "request[ed that the Court of Appeals] consider and review all issues outlined in defendant-appellant's brief," the result here would be different and the remaining claims would have been fairly presented to the Court of Appeals.

206 F.3d 196, 198–99 (2d Cir. 2000) (emphasis added).

In a seemingly incongruous, but appropriate decision based upon State law, federal courts have held that supplying the New York Court of Appeals with a lower court brief may be sufficient to raise a claim before the State's high court. As then-judge Sotomayor explained:

> [W]e can only conclude that the [New York] Court of Appeals would construe the *concise application* in this case as a request for review of all of the issues outlined in the briefs. While the petitioner did not expressly request review of "all issues" as in *Morgan*, such an explicit Statement is unnecessary where the only "fair

import" of the total application suggests a request for review of all the issues argued to the Appellate Division. We noted in *Ramirez* that "[r]eferences to attached briefs without more [may] preserve issues ... if the [New York] Court of Appeals is clearly informed that the reference is asserting issues in those briefs as bases for granting leave to appeal." It is not in dispute that Galdamez's Appellate Division briefs fairly presented his claims that the prosecutor's indirect use of hearsay claims violated his Confrontation Clause and due process rights. Because the briefs fairly presented the federal claims, and Galdamez's leave application reasonably could be construed only as a request for further appellate review of all issues in the attached briefs, we hold that Galdamez properly exhausted his federal claims before the Court of Appeals.

*Galdamez*, 394 F.3d at 76–77 (internal citations removed) (emphasis added).

It is appropriate for federal courts to construe *their own* exhaustion doctrine to include a reference in a brief filed in the Appellate Division and attached to the application to the New York Court of Appeals for permission to appeal. This is a matter of federal law influenced by State practice.

*Galdamez* distinguished, but did not overrule, *Jordan* and the cases upon which that decision relied. The import is that a petitioner who files a short letter seeking review of all of the claims raised in the Appellate Division is better off, for federal habeas presentment purposes, than the person who files a detailed application for leave to the New York high court.

There is a third scenario—do both: first, file a short application raising all claims, and then supplement that application with a more focused, in-depth brief. Leave procedure in the New York Court of Appeals permits a defendant to file an application first with the Chief Judge of the Court, who then may assign the application to another judge. *See* N.Y. Crim. Proc. Law § 460.20. This allows a defendant to file two requests for leave: one addressed to the Chief Judge and a follow-up letter to the judge assigned to the case. *Id*.

The effect of using the third path for federal presentment purposes was illustrated by the Court of Appeals for the Second Circuit in *Morgan v. Bennett,* 204 F.3d 360, 369 (2d Cir. 2000).

In that case, a defendant filed an initial leave application with the New York Court of Appeals enclosing copies of his brief before the Appellate Division, and requesting "review [of] *all issues outlined in defendant-appellant's* brief and *pro se supplemental brief.*"  *Id.* at 369–70 (emphasis in original).  He then submitted a detailed letter supporting his leave application that did not address all issues, including a Confrontation Clause claim he sought to raise on habeas review. *Id.* at 370.

The Court of Appeals for the Second Circuit held that the supplemental brief did not eliminate claims from the review of the New York Court of Appeals and his Confrontation Clause claim was fairly presented.  It reasoned:

> [T]he present case differs significantly from *Grey v. Hoke*, in which the request for leave to appeal was made in a letter that mentioned one issue but did not mention two others as to which habeas relief was eventually sought. In the present case, in contrast, Morgan's initial letter to the Court of Appeals expressly "request [ed] this Court to consider and review all issues outlined in defendant-appellant's brief and pro se supplemental brief" submitted to the Appellate Division. *That statement was sufficiently specific to alert the Court of Appeals that Morgan sought review of all of the issues raised in his pro se supplemental Appellate Division brief.*

*Id.* at 370–71 (emphasis added) (internal citation removed).

The Court of Appeals for the Second Circuit did not "think it appropriate to infer that the New York Court of Appeals would construe counsel's second letter as eliminating issues as to which review had been expressly requested."  *Id.* at 371.   The second letter emphasized that it was meant to "supplement," and not replace, the request made by the first letter.  *Id.*  A petitioner may thus avoid a harsh result of preclusion of an issue from exhaustion by filing a short letter requesting review of all claims before the appellate division and then submitting a letter that elaborates on some, but not all, of the claims.

3. Comity and Presentment to the New York Court of Appeals

Comity—"reduc[ing] friction between the state and federal court systems"—undergirds the exhaustion requirement. *O'Sullivan*, 526 U.S. at 845. As one commentator notes, comity and federalism are related but distinct concepts: "While comity describes the deference one sovereign is to afford the judgments of another, federalism denotes authority diffused between state and national institutions." Lee Kovarsky, *AEDPA'S Wrecks: Comity, Finality, and Federalism*, 82 Tul. L. Rev. 443, 456 (2007).

"[F]ederal courts have internalized the idea that [28 United States Code § 2254's (AEDPA)] legislative history supports an interpretive mood disfavoring habeas relief." *Id*. at 444. This limiting approach is incomplete:

> Comity is a concept that originated in international law. Justice Gray wrote over a century ago: "The extent to which the law of one nation, as put in force within its territory . . . shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call 'the comity of nations'." He continued, "'Comity' . . . is the recognition which one nation allows within its territory to . . . acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."

> This concept took a circuitous route into habeas law. The Constitution requires a state to give "full faith and credit" to the judicial rulings of another state. The requirement that federal courts give preclusive effect to state rulings is, by contrast, imposed by the Act of May 26, 1790. Courts limited the 1790 statute's sweeping language by reasoning that it merely applied extant principles of international comity to the federal-state relationship. None of this meant much for habeas until 1867, when Congress made the writ available to state prisoners. Nineteen years later, in *Ex parte Royall*, the Court formulated the modern exhaustion requirement and in so doing, invoked the version of federal-state comity that was articulated as a limit to the 1790 Act. Congress codified the exhaustion rule in 1948, and it remains a creature of statute today.

> Congress has incorporated common law doctrines that reflect comity, but it has never statutorily defined the term. As a result, there exists inevitable disagreement about what comity means. Despite such disagreement, the following statements seem indisputable. First, an interest in comity arises when a criminal judgment of a state court of competent jurisdiction becomes final. Second, . . . comity has not

required categorical deference to a state court of competent jurisdiction. Third, "Comity . . . dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief."

*Id.* at 455–56.

The current doctrine of presentment to the New York Court of Appeals, which can be seen as favoring State prosecutors, may create unnecessary burdens on the State court system. The practitioner working on an application for leave before the State high court is encouraged by the federal courts' presentment doctrine to raise every conceivable federal claim. This approach is questionable: such an approach is less than helpful to a judge on the State's highest court. Focused advocacy helps a judge determine which issues are important and viable. An overly inclusive brief may cause judicial error if the court fails to focus on the most substantial relevant issues and cases. Good appellate practitioners tell lawyers to go for the jugular, but, unfortunately, that vein is sometimes missed; the lawyer should not be held to have waived what might have been a winning appellate argument by not expanding on it in a case where losing on what turns out to be a critical issue creates a grave injustice.

Overburdened State courts of last resort with discretionary dockets may well seek to hear cases only of unsettled law or those with broad public policy implications for the State. Raising a federal issue in a leave application to the New York Court of Appeals where the law is "clearly established," *see infra* Section III(C), is an unlikely avenue to a successful application. *Cf.* Clerk's Office New York Court of Appeals, *The New York State Court of Appeals Criminal Leave Application Practice Outline*, at 11 (2018), https://www.nycourts.gov/ctapps/forms/claoutline.pdf (suggesting that practitioners focus on novel legal issues or those not well-settled in application for leave to the New York Court of Appeals). A doctrine focused on protecting the State court from "look[ing] for a needle in a

paper haystack" may, in fact, do just the opposite, and cause the New York Court of Appeals to sift through issues of federal law raised purely for possible federal preservation purposes.

Comity may be eroded by the very doctrine that seeks to protect it. The Supreme Court of the United States recognized this possibility in the case that established the necessity of raising federal constitutional issues in discretionary applications before a state's high court:

> We acknowledge that the rule we announce today—requiring State prisoners to file petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State—has the *potential* to increase the number of filings in State supreme courts. We also recognize that this increased burden may be unwelcome in some State courts because the courts do not wish to have the opportunity to review constitutional claims before those claims are presented to a federal habeas court. Under these circumstances, . . . the increased, unwelcome burden on State supreme courts disserves the comity interests underlying the exhaustion doctrine.

*O'Sullivan*, 526 U.S. at 847 (internal citations omitted) (emphasis in original).

### C. AEDPA Review

Congress created a deferential standard of review for federal courts sitting as habeas courts reviewing a state court decision. The standard is as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Summary disposition of an issue qualifies as "on the merits." *Chrysler v. Guiney*, 806 F.3d 104, 117 (2d Cir. 2015) ("Although the Second Department ruled on Chrysler's claim in summary fashion, summary dispositions rank as adjudications 'on the merits' for AEDPA

purposes unless the petitioner provides 'reason to think some other explanation for the state

court's decision is more likely.'" (quoting *Harrington v. Richter*, 562 U.S. 86, 99–100 (2011))).

About the "contrary to" clause the Supreme Court has explained:

The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. . . . A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.

*Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

An "unreasonable application" of constitutional law is an analytically distinct standard of

review.

[A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case.

The term "unreasonable" is no doubt difficult to define. That said, it is a common term in the legal world and, accordingly, federal judges are familiar with its meaning.

*Id.* at 409–10. Stated somewhat differently, the Court has explained that "[a] state court's

determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at

101.

"Clearly established Federal law" in 28 U.S.C. § 2254(d) means that the law must have

been stated in "holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of

the relevant state-court decision." *Williams*, 529 U.S. at 412. Courts have held that the doctrine of vindictive sentencing is clearly established. *See infra* Section III (D)(1).

      D.    Vindictive Sentencing Claim

         1.    Doctrine

*North Carolina v. Pearce* announced the doctrine of vindictive sentencing. 395 U.S. 711 (1969). In *Pearce*, the Supreme Court held that a defendant could not be penalized with an unduly harsh sentence after his initial conviction was vacated by an appellate court. While noting that a judge was not bound by the prior sentence, the Court stated: "vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." *Id*. at 725. To prevent vindictiveness, the Court "concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear." *Id*. at 726. "The *Pearce* framework was not limited by the Supreme Court to sentencings after re-trials, but rather has been applied by the Supreme Court to other situations, such as claims of prosecutorial vindictiveness in connection with plea negotiations." *Izaguirre v. Lee*, 856 F. Supp. 2d 551, 572 (E.D.N.Y. 2012).

*Pearce* suggested that a presumption of vindictiveness applies in all cases where a defendant receives a longer sentence following a retrial or plea bargain. *Cf. Alabama v. Smith*, 490 U.S. 794, 803 (1989) (Marshal, J., dissenting) ("I . . . continue to believe that, if for any reason a new trial is granted and there is a conviction a second time, the second penalty imposed cannot exceed the first penalty." (internal quotation marks omitted)). In *Smith*, however, the Supreme Court held: "when a greater penalty is imposed after trial than was imposed after a prior guilty plea, the increase in sentence is not more likely than not attributable to the vindictiveness on the part of the sentencing judge." *Id*. at 801. It overruled its precedent to the

extent that it had suggested that *all* higher sentences following retrial were presumptively

unconstitutional. *Id*. at 802.

The *Smith* Court synthesized relevant precedents as follows:

> Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. In order to assure the absence of such a motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for him doing so must affirmatively appear." Otherwise, a presumption arises that a greater sentence has been imposed for a vindictive purpose—a presumption that must be rebutted by objective information ... justifying the increased sentence.

> While the *Pearce* opinion appeared on its face to announce a rule of sweeping dimension, our subsequent cases have made clear that its presumption of vindictiveness do[es] not apply in every case where a convicted defendant receives a higher sentence on retrial. As we explained in *Texas v. McCullough*, "the evil the [*Pearce* ] Court sought to prevent" was not the imposition of "enlarged sentences after a new trial" but "vindictiveness of a sentencing judge." Because the *Pearce* presumption "may operate in the absence of any proof of an improper motive and thus . . . block a legitimate response to criminal conduct," we have limited its application, like that of "other 'judicially created means of effectuating the rights secured by the [Constitution],'" to circumstances "where its 'objectives are thought most efficaciously served,'" *Such circumstances are those in which there is a "reasonable likelihood," that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority.* Where there is no such reasonable likelihood, the burden remains upon the defendant to prove actual vindictiveness.

*Id*. at 798–99 (internal citations removed) (emphasis added).

Under circumstances where it was "reasonably likely" that the sentence was vindictive, a

presumption of vindictiveness arises. Once the presumption attaches, it may be "overcome only

by objective information in the record justifying the increased sentence." *United States v.

Goodwin*, 457 U.S. 368, 374 (1982). The Supreme Court's framework means that in cases where

the presumption attaches, a court need not make a determination about the actual motivation of

the sentencing judge.

Courts have found that the *Pearce* standard is "clearly established" for purposes of federal habeas review. *See Izaguirre*, 856 F. Supp. 2d at 573 ("[F]or purposes of habeas review, this Court concludes that this *Pearce* standard was clearly established federal law, as articulated by the Supreme Court."); *United States v. Mazzaferro*, 865 F.2d 450, 458 (1st Cir. 1989) ("One of the fundamental principles of our jurisprudence is that a defendant cannot be punished for exercising a constitutional right and that vindictiveness is to play no role in the sentencing of defendants.").

The vindictive sentencing claim in the instant case is based on Supreme Court law well-developed before petitioner's sentencing. *Izaguirre*, 856 F. Supp. 2d at 578 ("The rule is based upon holdings, not dicta, of this nation's highest court and its application here does not require an 'extension' of that rule; rather, the application here requires reference only to the core, well-established rule itself.").

2. Trial Penalty

Vindictive sentencing doctrine protects a defendant from egregious instances of the "trial penalty"—when a defendant receives a harsher sentence because she goes to trial, rejecting a plea offer. Penalties for pressing trial rights have been discussed by courts and academics, with both acknowledging that modern criminal adjudication is "a system of pleas, not a system of trials." *Lafler v. Cooper*, 566 U.S. 156, 170 (2012). "Ninety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas." *Id.*

As noted by a recent report:

Guilty pleas have replaced trials for a very simple reason: individuals who choose to exercise their Sixth Amendment right to trial face exponentially higher sentences if they invoke the right to trial and lose. Faced with this choice, individuals almost uniformly surrender the right to trial rather than insist on proof beyond a reasonable doubt, defense lawyers spend most of their time negotiating guilty pleas rather than ensuring that police and the government respect the boundaries of the law including

the proof beyond a reasonable doubt standard, and judges dedicate their time to administering plea allocutions rather than evaluating the constitutional and legal aspects of the government's case and police conduct.

National Association of Criminal Defense Lawyers, *The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It*, 5 (2018), www.nacdl.org/trialpenaltyreport; *but see* David S. Abrams, *Putting the Trial Penalty on Trial*, 51 Duq. L. Rev. 777, 778 (2013) ("[N]ot only is there no evidence for a trial penalty, there appears to be a trial discount!"); Andrew Chongseh Kim, *Underestimating the Trial Penalty: An Empirical Analysis of the Federal Trial Penalty and Critique of the Abrams Study*, 84 Miss. L.J. 1195, 1199 (2015) ("This Article exposes significant conceptual and methodological errors that undermine the conclusions of the Abrams study.").

There is a tension between the doctrine of vindictive sentencing and the current reality of our plea driven criminal justice system. *See generally* Doug Lieb, *Vindicating Vindictiveness: Prosecutorial Discretion and Plea Bargaining, Past and Future*, 123 Yale L.J. 1014 (2014). In many cases, prosecutors utilize the prospect of higher sentences to induce defendants to plead guilty. The Supreme Court has recognized as much:

> There is no doubt that the breadth of discretion that our country's legal system vests in prosecuting attorneys carries with it the potential for both individual and institutional abuse. And broad though that discretion may be, there are undoubtedly constitutional limits upon its exercise. We hold only that the course of conduct engaged in by the prosecutor in this case, which no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution, did not violate the Due Process Clause of the Fourteenth Amendment.

*Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978).

The friction is obvious in the federal system. The Sentencing Guidelines provide a credit for accepting responsibility, usually by pleading guilty, and adds a credit for pleading guilty early. U.S.S.G. § 3E1.1(a) ("If the defendant clearly demonstrates acceptance of responsibility

for his offense, decrease the offense level by 2 levels."); *id.* § 3E1.1(b) ("If the defendant [accepts responsibility] . . . [and] timely notif[ies] authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level."); *cf.* National Association of Criminal Defense Lawyers, *supra*, at 12 ("USSG §3E1.1(b) should be amended to authorize courts to award a third point for acceptance of responsibility if the interests of justice dictate without a motion from the government and even after trial.").

Commentators have offered solutions to combat the negative consequences that can arise from the imposition of the trial penalty. *See, e.g.*, Jed S. Rakoff, *Why Prosecutors Rule the Criminal Justice System—And What Can Be Done About It*, 111 Nw. U. L. Rev. 1429, 1436 (2017) (suggesting that prosecutors be "required to spend six months out of every three years of their term . . . serving as defense counsel for indigent defendants"); James Vorenberg, *Decent Restraint of Prosecutorial Power*, 94 Harv. L. Rev. 1521, 1523 (1981) (suggesting strict administrative guidance to curb prosecutorial discretion); National Association of Criminal Defense Lawyers, *supra*, at 12–13 (making ten recommendations to reduce the force of the trial penalty including adopting a principle of "proportionality between pre-trial and post-trial sentencing"); *cf. United States v. Holloway*, 68 F. Supp. 3d 310 (E.D.N.Y. 2014) (lauding the United States Attorney's Office for the Eastern District of New York for using its discretion to have an excessive sentence vacated).

The Supreme Court of the United States has acquiesced in the system leading to pleas rather than trials. *See, e.g.*, *Lafler*, 566 U.S. at 156 (holding that counsel may be constitutionally ineffective by giving improper advice that causes a defendant to reject a plea offer);

*Bordenkircher*, 434 U.S. at 365 (recognizing that prosecutors maintain broad discretion in plea bargaining). Vindictive sentencing doctrine, nonetheless, remains an important check on the trial penalty. *Cf. Izaguirre*, 856 F. Supp. 2d at 578 (holding that habeas relief was warranted where a judge sentenced a defendant under circumstances that showed vindictiveness because the defendant refused a plea offer).

IV. Application of Law to Facts

A. Nature of Instant Habeas Motion

1. Characterizing an Application as Successive Rule 60(b) Motion Rather Than as Successive Habeas Petition

The instant motion does not present a new claim and may be heard as a Rule 60(b) motion. Garcia proceeded *pro se* in his habeas petition after his motion for the appointment of counsel was denied prior to the case being transferred to the present trial judge. Order, ECF No. 24, Oct. 24, 2002. Permission was granted by that judge for movant to amend his habeas petition to add the following claim, movant articulated as: "Defendant's aggregated sentence of 125 years should be modified in the interest of justice given its disparity with the plea offer." Decl. in Opp'n ¶¶ 36–37. Soon after, he submitted the Epstein Letter in support of this claim. Ltr. from D. Garcia, ECF No. 140-1, July 24, 2003.

The argument mirrored some phrasing from petitioner's brief to the New York State Appellate Division, but did not unequivocally raise a federal constitutional issue. Unlike the Appellate Division brief, no federal law was cited accompanying the claim. (He did later supplement his argument to include cites to United States Constitutional Amendments V and XIV. *See id.*). The thrust of the argument, however, plausibly could have been construed to raise a claim of unconstitutional vindictive sentencing in light of the special "solicitude" owed to a *pro se* litigant. *See Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir. 1983) ("[D]ue to the

*pro se* petitioner's general lack of expertise, courts should review habeas petitions with a lenient eye, allowing borderline cases to proceed."); *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) ("Trial courts have been directed to read *pro se* papers liberally.").  Garcia attempted to base this claim on the same factual allegations underlying the vindictive sentencing claim that he now, with the assistance of counsel, plainly brings before this court—he was penalized for going to trial after rejecting the trial court's flat offer of 20 years on all counts.  *See* Ltr. from D. Garcia, ECF No. 140-1, July 24, 2003.

In the instant case, the substance of the vindictive sentencing claim was not addressed in the memorandum and order denying the federal habeas petition.  *See* Mem., J. & Order, ECF No. 39, Sept. 25, 2003

Defendant's Rule 60(b) motion does not raise a "new" claim.  It is a request to revisit the judgment of dismissal because his vindictive sentencing claim was not decided on the merits.  It may be heard in the first instance by the district court as a rule 60(b) motion; it is not a successive habeas application.  *Cf. Gonzalez* 545 U.S. at 533 ("When no 'claim' is presented, there is no basis for contending that the Rule 60(b) motion should be treated like a habeas corpus application."); *Stewart*, 523 U.S. at 643 ("Respondent was entitled to an adjudication of all of the claims presented in his earlier, undoubtedly reviewable, application for federal habeas relief."). Any barrier from an objection that the instant motion is a successive habeas petition, *see* 28 U.S.C. § 2244, is overcome by the fact that he has been trying to raise—primarily *pro se*—the same constitutional issue since the beginning.

## 2. Timeliness of Motion

Petitioner's Rule 60(b) motion is timely. The long procedural history of the case paints a complicated picture largely due to the lack of counsel. *Compare supra* Section II(B)(1)(chart of complete procedural history), *with infra* Appendix A (timeline of habeas motions).

Garcia's habeas petition was denied by the court in September of 2003; he was not granted a certificate of appealability. *See* Mem., J. & Order, ECF No. 39, Sept. 25, 2003; Mandate, ECF No. 52, Apr. 13, 2004. He filed a motion for reconsideration of the judgment denying his petition less than a year later and has filed additional "Rule 60(b) motions" in 2008, 2010, and 2013. *See* Appendix A. Since all prior Rule 60(b) motions were filed and decided without counsel, the motions did not coherently state a claim to relief for vindictive sentencing. Petitioner's current Rule 60(b) motion, supported by appointed counsel, now states in clear terms a federal constitutional issue upon which the court may, and should have, granted relief—for vindictiveness.

Garcia's diligence in pursuing this claim is apparent from the litigation history. *See supra* Section II(B)(1) (table of procedural history); *infra* Appendix A (timeline of motions). That he did not have an attorney or legal training to assert the Rule 60(b) claim clearly does not mean that he lacked diligence.

## 3. 60(b) Motion Following Federal Court of Appeals' Decision

Upon appeal of the district court's decision denying the writ and certificate of appealability, the Court of Appeals for the Second Circuit denied a certificate of appealability and dismissed the appeal. The mandate stated in full:

> Appellant, *pro se*, moves for a certificate of appealability in his appeal from the district court's denial of his 28 U.S.C. § 2254 petition. Upon due consideration, it is ORDERED that the motion is denied and the appeal is dismissed. *The appellant*

> *has not made a "substantial showing of the denial of a constitutional right."* 28 U.S.C. § 2253(c).

Mandate, ECF No. 52, Apr. 13, 2004 (emphasis added).

The Federal Court of Appeals *did not* hold that Garcia's constitutional rights were or were not violated. By implication, had he made such a showing of a constitutional violation, relief would have been granted on appeal.

As demonstrated in this memorandum, *see infra* Section IV(C), Garcia—now represented by counsel—has made an *actual showing of a constitutional violation*. This court has the authority, pursuant to Rule 60(b), to reopen the judgement and grant the writ. *See infra* Section V; *cf. Gonzalez* 545 U.S. at 527, 536 (holding that "[t]he Eleventh Circuit [] erred in holding that . . . Rule 60(b) relief," was unavailable, even though a certificate of appealability was denied by the intermediate appellate court). *Gonzalez* in effect, as in the present case, approved granting the writ on a Rule 60(b) motion.

### 4. Residual Writ of Habeas Corpus

Alternatively, the claim is reviewable under the residual right to habeas review. *See supra* Section III(A)(4). The claim here—of a more than life sentence based on vindictiveness—warrants such a review to avoid a clear injustice. *Cf. Stewart*, 523 U.S. at 643. ("This may have been the second time that respondent had asked the federal courts to provide relief on his [] claim, but this does not mean that there were two separate applications, the second of which was necessarily subject to § 2244(b).").

### B. Exhaustion of State Remedies

### 1. Argument in New York State Appellate Division

Petitioner presented the legal premise of a vindictive sentencing claim in his direct appeal to the Appellate Division. Through counsel he raised the claim under the subheading:

"Appellant's aggregate sentence of 125 years should be modified in the interest of justice given its disparity with the plea offer," and citing United States Constitutional Amendments V and XIV. *See* Relevant Portion of Petitioner's State Appellate Division Brief, Appendix B. The relevant section of the brief alerts the reader to the constitutional issue of vindictive sentencing:

> [A]ppellant was *improperly penalized for exercising his right to trial*. Before trial, the plea offer was fifteen to thirty years in exchange for his guilty plea to the charges contained in the indictment. After trial on all of the charges, appellant received an aggregate sentence of one hundred and twenty-five years—a term of 75 years imposed upon the present convictions to be served consecutively to a term of 50 years imposed upon his October 26, 1998, convictions for the remaining charges in the indictment. Even taking into account the statutory limitation on the length of his sentence, *see* P.L. §70.30(1)(e)(vi), his sentence is approximately three times greater than that contemplated by the plea bargain. *See People v. Cosme*, 203 A.D.2d at 376; *see also Bordenkircher v. Hayes,* 434 U.S. 357, 363 (1979) ("*To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort*").

*Id*. at 31 (emphasis added; page number in original).

A court in the Southern District of New York reached the conclusion of exhaustion in a factual situation nearly identical to the instant case. *See Naranjo v. Filion*, No. 02-cv-5449WHP-AJP, 2003 WL 1900867 (S.D.N.Y. Apr. 16, 2003). In *Naranjo*, a petition raised a vindictive sentencing claim in the Appellate Division, stating: "*The fact that appellant chose to go to trial, rather than to plead, does not allow for vindictiveness in sentencing.*" *Id*. at *4 (emphasis in original). The same federal case, *Bordenkircher v. Hayes*, was cited with the same parenthetical in both the instant case and in *Naranjo*. *Id*. The court concluded: "[c]ontrary to the State's assertions . . . *Naranjo has exhausted his vindictive retaliation claim because he cited a Supreme Court case on that issue, with a parenthetical quotation about a 'due process violation.'*" *Id*. at *7 (emphasis added).

Garcia's Appellate Division brief similarly cited the federal constitution and a federal case; it asserted a fact pattern—retaliation for going to trial—within the mainstream of

constitutional litigation. *See Abdurrahman* 897 F.2d at 73 ("The State court may be alerted to constitutional claims by reliance on federal and State cases . . . or alleging facts within the mainstream of constitutional litigation.") (internal quotation marks omitted). The Appellate Division was fairly presented with the federal claim of vindictive sentencing. *Id.* ("Adherence to exhaustion principles does not require a petitioner to raise his claims 'by citing chapter and verse' of hornbook law; it simply mandates that the State be given a fair opportunity to hear the claim.").

It bears noting that, although the subjective intent of the attorney drafting the brief is not dispositive of the presentment issue, the experienced State Legal Aid practitioner in this case intended to raise the vindictive sentencing issue in Garcia's Appellate Division brief—and believes she did so. *See supra* Section II(C)(1). She concluded that by citing the United States Constitution and federal case law on the point, she alerted the Appellate Division to the vindictive sentencing claim—Garcia was penalized for going to trial. *Id.*

There is a serious question whether petitioner's judicial vindictiveness claim can be held by this federal trial court to have been exhausted in the State Appellate Division. The factual premise of his State claim was based on the prosecution's pre-trial plea offer of 15–30 years, rather than the trial court's 20 year flat offer on which the federal claim is based. The factual allegations underlying the claim in the instant motion cast the vindictive sentencing claim in a "significantly different light" and thus it can be concluded that it was not fairly presented in State court. *Davidson* 107 F.3d at *12 (internal quotation marks omitted); *see also Rodriguez v. Hoke, 928* F.2d 534, 538 (2d Cir.1991) ("state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole" (citation and internal quotation marks omitted)); *cf.* 28 U.S.C. § 2254(e)(1) (presumption of accuracy in

State factual conclusion after State evidentiary hearing must be rebutted by "clear and convincing evidence").

After all the delays, to force the defendant to retry this issue and exhaust may appear to be an abuse of the doctrine of exhaustion. But, this court must adhere to the restrictions placed on federal trial courts by 28 U.S.C. §§ 2244, 2254. Much of the difficulty in federal courts' processing of state sentences arises because of "fundamental issues in the administration of our dual court system"; these need to be addressed with more flexibility and an eye on our goal— justice—rather than by restrictions. *Cf.* Arthur R. Miller, *Widening the Lens: Refocusing the Litigation Cost-and-Delay Narrative*, 40 Cardozo L. Rev. 57, 71 (Oct. 2018) ("A significant portion of the litigation activities engaged in by courts and counsel involve fundamental issues about our dual court system.").

### 2.      Exhaustion in New York Court of Appeals

Garcia's claim of vindictive sentencing based on the prosecutor's pre-trial plea offer was properly raised before the New York Court of Appeals in his application for leave to that court. Respondent conceded at argument that if the issue of vindictive sentencing was raised in the Appellate Division, then it was sufficiently presented to the New York Court of Appeals. *See* Sept. 13, 2018 Hr'g Tr. 11:22–25. This concession was based on both the facts and law. *Cf. Antiterrorism and Effective Death Penalty Act- Habeas Corpus-Scope of Review of State Proceedings-Wilson v. Sellers*, 132 Harv. L. Rev. 407, 416 (2018) ("[F]ederal habeas courts should 'give appropriate deference to' the applicable state court decision . . . limiting the harsh effects of an unnecessarily strict interpretation of AEDPA." (citing *Wilson v. Sellers,* 138 S. Ct. 1188, 1192 (2018) ("[T]he federal court should 'look through' the unexplained decision to the

last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.")))

Garcia's initial two-page letter attached copies of the briefs before the Appellate Division and requested review of "*all issues outlined in defendant-appellant's briefs*." Petitioner's Initial Application for Leave to the New York Court of Appeals, Appendix C (emphasis in original). This assertion included the claim of vindictive sentencing raised in the Appellate Division. *See supra* Section IV(B)(1); *see also* Relevant Portion of Petitioner's State Appellate Division Brief, Appendix B (arguing the constitutional issue of vindictive sentencing). The Appellate Division brief that was presented to the New York Court of Appeals on behalf of defendant argued that Garcia "was *improperly penalized for exercising his right to trial*," and cited the Supreme Court case *Bordenkircher v. Hayes,* 434 U.S. 357 (1979), which addressed the federal constitutional issue of vindictive sentencing. *See* Appendix B.

This succinct letter and accompanying brief should have, and this court finds, based on its own evidentiary hearing, technically sufficiently alerted the Chief Judge of the New York Court of Appeals to the vindictive sentencing issue. *See Morgan*, 204 F.3d at 370–71 ("Morgan's initial letter to the Court of Appeals expressly 'request[ed] this Court to consider and review all issues outlined in defendant-appellant's brief and pro se supplemental brief' submitted to the Appellate Division. . . . That statement was sufficiently specific to alert the Court of Appeals [Chief Judge] that Morgan sought review of *all of the issues* raised in his pro se supplemental Appellate Division brief." (internal citation omitted) (emphasis added)); *Galdamez*, 394 F.3d at 76–77 ("[W]e can only conclude that the [New York] Court of Appeals would construe the *concise application* in this case as a request for review of all of the issues outlined in the [Appellate Division] briefs." (emphasis added)).

The New York Court of Appeals does not have jurisdiction to hear sentencing modification claims on the grounds of a violation of its sense of justice, *see supra* Section III(B)(2), but it can review the legality of a sentence, including whether it was constitutionally imposed. Henry Cohen & Arthur Karger, *Powers of the NY Court of Appeals* § 21:8 ("[T]he jurisdiction of the Court of Appeals in relation to the sentence is limited to the review of questions of law affecting the sentence."). The vindictive sentencing claim raised before the Appellate Division—asserting a violation of the Due Process Clause—could have been heard by the New York Court of Appeals. *E.g.*, *People v. Van Pelt*, 76 N.Y.2d 156, 160 (1990) (New York Court of Appeals addressing a vindictive sentencing claim under the Federal and State Constitutions).

That petitioner filed additional letters addressing only certain issues as part of his leave application does not alter the general exhaustion analysis. *Morgan*, 204 F.3d at 371 ("[W]e do not think it appropriate to infer that the New York Court of Appeals would construe counsel's second letter as eliminating issues as to which review had been expressly requested."). Garcia's counsel's supplemental letter to the New York Court of Appeals expressly purported to "to augment the arguments contained in the Appellate Divisions briefs," not to supplant them. *See* Supplemental Application for Leave, *People v. Garcia*, ECF No. 117, Ex. A, Aug. 7, 2001; *Morgan*, 204 F.3d at 371 ("The reference in the Court Clerk's Letter to 'supplemental' arguments appears to indicate that follow-up letters would be considered in addition to, not in lieu of or as a limitation on, the issues raised in counsel's initial letter."). Consistent with this precedent, federal courts in the Second Circuit can rely on the standard practice in the New York Court of Appeals to submit the Appellate Division briefs and a short letter requesting review of all issues raised in the Appellate Division, supplementing the letter with additional filings.

Nonetheless, for the same reasons as stated above in Section IV(B)(1), the vindictiveness claim in Garcia's present motion was probably never clearly and fairly presented in the New York Court of Appeals in the sense that it reasonably would have alerted the Chief Judge. *See supra* Section IV(B)(1). That court probably never had the opportunity to plainly consider "essential factual allegations"—i.e. the trial court's 20 year flat plea offer—underlying his federal claim. *See Daye*, 696 F.2d at 191.

That counsel for petitioner thought she was raising the constitutional claim is understandable since she was aware that the "justice" decision of the Appellate Division was not before the State's highest court—only the constitutional excessive sentence claim was.

## C. Vindictive Sentencing

The evidence shows that Garcia was unconstitutionally vindictively sentenced. The Appellate Division's ruling that the sentence was "not excessive," *see People v. Garcia*, 284 A.D.2d 481 (2001), was an unreasonable application of "clearly established" federal constitutional law. *See supra* Sections III(C), (D). Garcia was informed that he would be retaliated against if he went to trial a second time and he was in fact seriously punished for exercising that right.

The disparity between the plea offer—20 years—and the sentence imposed—125 years—is presumptively vindictive. *Cf. Balsavage v. Wetzel*, 545 F. App'x 151, 155 (3d Cir. 2013) ("[T]hat [petitioner's] current sentence exceeds his original sentence by a factor of seven further shows the reasonable likelihood that it is the product of judicial vindictiveness."). If 20 years could be said to fulfill legitimate penological goals (deterrence, incapacitation, retribution, and rehabilitation), then this sentence six times its promised length is excessive. There is no apparent

reason why 105 additional years imprisonment would be necessary to accomplish acceptable correctional goals.

The two sentences differ in kind: a 20 year sentence would likely have allowed Garcia to live a significant portion of his life outside of prison. A sentence of 125 years is a sentence of life—petitioner stands no chance of leaving prison before he dies unless the serious constitutional injustice done to him is corrected. A gubernatorial pardon is unlikely.

The current system of plea bargaining in the United States theoretically allows for some level of incentivizing guilty pleas on the basis of the need to reduce burdens on trial courts. *See Bordenkircher*, 434 U.S. at 364 ("While confronting a defendant with the risk of more severe punishment clearly may have a discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable—and permissible—attribute of any legitimate system which tolerates and encourages the negotiation of pleas." (internal quotation marks omitted)). "[T]he relevant sentencing information available to the judge after the plea will usually be considerably less than that available after a trial," which may lead to an increased sentence. *Smith*, 490 U.S. at 801. Prosecutors and courts are not limited by pretrial offers. But a disparity of the magnitude in the instant case proves the sentence's illegitimacy.

It is interesting to note in connection with analyzing State practice, that a federal judge "must not participate" in plea discussions. Fed. R. Crim. P. 11(c)(1). The manner in which the plea deal was offered and communicated to Garcia tended to color the offer. The judge offered the defendant "a flat 20 to cover everything." Epstein Ltr. The offer came after petitioner had already been tried and convicted of robbery and attempted murder and was facing additional related charges. The court had observed the defendant at trial and heard full testimony from witnesses and victims. When the court's plea offer was rejected, on the first convictions alone

the court sentenced petitioner to 50 years imprisonment.  *See* Oct. 26, 1998 Sent. Hr'g Tr. 11:11–22.

The plea offer was communicated to petitioner's stand-by counsel, who then relayed the message with its implied judicial threat:  "It is your decision, but remember you have nothing to gain by going to trial on the other cases, since *if the judge sees defiance he will sentence you to more than the 20 years just on this conviction* (which is his legal right)."  Epstein Ltr. (emphasis added).  Pressing a right to trial would mean, "to put it harshly, you will surely never walk out of a prison again."  *Id*.  Mr. Epstein's letter was corroborated when the judge followed through with his explicit and implied threat and sentenced petitioner to a term of years much longer than his lifespan.  Decision & Order on 440.10 Motion, ECF No. 130, Ex D, June 29, 2010 (Sentencing Judge: "Both the court and standby counsel *unequivocally informed the defendant* that he was facing an *extremely long sentence* if convicted of all four robbery incidents *after trial."* (emphasis added)).

A presumption of vindictiveness exists, "which may be overcome only by objective information in the record justifying the increased sentence."  *Goodwin*, 457 U.S. at 374.  No justification was given on the record for the imposition of this harsh sentence.  The plea offer was made only 12 days before petitioner's first sentencing (where he received 50 years imprisonment) and no significant intervening event occurred, other than the rejection of the plea offer.

V.      Conclusion

The court makes the following findings of fact based on clear and convincing evidence:  *One*, the court finds that the letter described in the petitioner's motion was authentic and admissible.  *See* Epstein Ltr.  *Two*, it finds that the trial court offered the defendant "20 years

flat" for a guilty plea on all counts after the verdict in the first trial. This offer was conveyed by the trial court through Mr. Epstein, acting as stand-by counsel assisting the *pro se* defendant, in a private off the record sidebar in which Mr. Epstein and the trial court—but not the defendant— were present. The court makes no finding as to whether the Assistant District Attorney was present at this sidebar. *And three*, it finds that upon the defendant insisting on going to trial on the remaining counts after he was found guilty in the first trial, the trial court vindictively sentenced him on all counts to 125 years.

In the end, were this case to be decided at this time by this court, the petitioner's motion would be granted and the State would be ordered to resentence Garcia non-vindictively. But, it cannot be granted at this time because of the strict limitations on this court under 2254 of Title 28 reasonably construed, i.e.:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>> (A) the applicant has exhausted the remedies available in the courts of the State; or
>> (B)(i) there is an absence of available State corrective process; or
>> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant. . . .
> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented. . . .
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

This court finds:

(a) The applicant has not exhausted the remedies which may be available in the State

courts. He must exhaust those remedies, if any, available to him at this time. 28

U.S.C.. § 2254(b)(1)(A); *see also id.* § 2244 (finality of state determination). If there

is no longer a viable state remedy, there is no need for further exhaustion. *Id.* § 2254(b)(1)(B)(i)(ii); *see also id.* § 2254(c).

(b) The State has not waived the exhaustion requirement. *Id.* § 2254(b)(3);

(c) The claim was not adjudicated on the merits in a State court proceeding; the issue was not explicitly and plainly raised at any level. *See id.* § 2254(d); and

(d) The State did not clearly have an opportunity to determine the factual issues in this case before this court did so. *Id.* § 2254(e).

In sum, the petition is denied. An application can be made in this court to reopen the case by letter when the defendant has exhausted remedies available, if any, under State law. *See infra* Section VII.

The analysis of this court that this is a Rule 60(b) claim, rather than a habeas corpus claim, remains in effect. If Garcia were to bring this claim again in federal court, this analysis, in this court's opinion, continues as the law of the case.

VI.    Judgment

The application for a writ of habeas corpus on behalf of David Garcia is denied. *See* U.S.C. § 2254.

No costs or fees are granted in view of the good faith of applicant and his lack of assets.

VII.    Stay

Petitioner's claims have merit and there is good cause to grant a stay of this court's final judgment in order to permit exhaustion of the claim of vindictiveness. Upon a final ruling on that claim in the State Courts, the writ will either be granted by the State and a new sentence imposed or not. If granted, the present case should be closed. If denied, the stay should be lifted and the writ granted by this court so it can be appealed by respondent if he wishes to do so.

The case shall remain on this court's calendar, marked "stayed," and kept as an open case in this court in the interim.

This is a case in that limited class of litigations where there was good cause for petitioner's failure to exhaust in State court and there is merit in his claim. It fits exactly in the class of cases where a stay should be issued. As the Supreme Court noted: "[S]tay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

It is vital that petitioner has the assistance of counsel in the State court.

SO ORDERED.

/s/ Jack B. Weinstein
Jack B. Weinstein
Senior United States District Judge

Date:   November 30, 2018
        Brooklyn, New York

VIII.  **Appendix A**: State Direct Appeal and Federal Habeas Corpus Petition Timelines



IX.  **Appendix B**: Relevant Portion of Petitioner's State Appellate Division Brief

**D.A.'S COPY**

To be argued by
KATHERYNE M. MARTONE
(10 Minutes)

## New York Supreme Court

APPELLATE DIVISION:  SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

        Respondent,

    -against-

DAVID GARCIA,

          Defendant-Appellant.

TO BE HEARD ON
ORIGINAL RECORD

Kings Co. Ind.
636/98
App. Div. No.
99-00955

### BRIEF FOR DEFENDANT-APPELLANT

M. SUE WYCOFF
Attorney for Defendant-
Appellant
90 Church Street
New York, New York 10007
212-577-3420

KATHERYNE M. MARTONE
Of Counsel
December 2000

Therefore, because appellant's request was "seemingly serious," the court was obliged to inquire sufficiently "to ascertain whether there [was] indeed good cause for the substitution," see People v. Sides, 75 N.Y.2d at 824, and its failure to do so requires a new suppression hearing without consideration of further harm, see People v. Arroyave, 49 N.Y.2d at 273 (harmless error analysis is inapplicable to violations of the right to counsel). Accordingly, the appeal should be held in abeyance, and the case remanded for a new suppression hearing.

<u>POINT III</u>

APPELLANT'S AGGREGATE SENTENCE OF 125 YEARS SHOULD BE MODIFIED IN THE INTEREST OF JUSTICE GIVEN ITS DISPARITY WITH THE PLEA OFFER. U.S. CONST., AMENDS. V, XIV; N.Y. CONST., ART. I, §6; P.L. §70.25(2).

This Court has the plenary power to modify a sentence as unduly harsh or excessive. While it is to be expected that a sentence imposed after trial may exceed the plea offer, a disparity with the plea bargain may be a consideration in reducing a defendant's sentence in the interest of justice. Here, the plea offer before trial was fifteen to thirty years. After trial, appellant received an aggregate determinate sentence of 125 years. Given this harsh disparity, appellant's sentence should be modified in the interest of

29

justice.[10]

This Court has the power to reduce a sentence in the interest of justice, even where the sentencing court did not abuse its discretion. C.P.L. §§450.10, 470.15(6)(b); People v. Suitte, 90 A.D.2d 80, 86 (2d Dept. 1982). "An intermediate appellate court has broad plenary power to modify a sentence that is unduly harsh or severe under the circumstances, even though the sentence may be within the permissible statutory range." People v. Delgado, 80 N.Y.2d 780, 783 (1992).

While it is "anticipated that sentences imposed after trial may be more severe than those proposed in connection with a plea," People v. Bellilli, 270 A.D.2d 355 (2nd Dept. 2000), a "disparity" with the plea offer may be a consideration in reducing a defendant's sentence in the interest of justice, see People v. Cosme, 203 A.D.2d 375, 376 (2d Dept. 1994). In Cosme, the defendant was sentenced as a persistent violent felony offender to twenty-five years to life. He had received a pre-trial plea offer of eight years to life to satisfy the charges as well as two other pending

---

[10]The authorized sentence for a second violent offender convicted of robbery in the first degree is a minimum determinate term of ten years and a maximum term of twenty-five years. P.L. §70.04(3)(a). By operation of statute, appellant's aggregate sentence is "deemed" to be fifty years. P.L. §70.30(1)(e)(vi).

indictments. People v. Cosme, 203 A.D.2d at 376. Given its disparity with the plea offer, this Court reduced the defendant's sentence in the interest of justice, concluding that "it appears that the defendant was impermissibly penalized for asserting his right to trial on his pending indictments." Id. (citations omitted).

Similarly, here, appellant was improperly penalized for exercising his right to trial. Before trial, the plea offer was fifteen to thirty years in exchange for his guilty plea to the charges contained in the indictment [sic]. After trial on all of the charges, appellant received an aggregate sentence of one hundred and twenty-five years -- a term of 75 years imposed upon the present convictions to be served consecutively to a term of 50 years imposed upon his October 26, 1998, convictions for the remaining charges in the indictment. Even taking into account the statutory limitation on the length of his sentence, see P.L. §70.30(1)(e)(vi), his sentence is approximately three times greater than that contemplated by the plea bargain. See People v. Cosme, 203 A.D.2d at 376; see also Bordenkircher v. Hayes, 434 U.S. 357, 363 (1979) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort"). (Emphasis added by instant court).

31

Although the offered indeterminate sentence was an illegal one, appellant could have received a determinate sentence of a minimum of ten years and a maximum of twenty-five years. P.L. §70.04(3)(a). At the very least, the plea bargain indicates that both the prosecution and the trial court considered a term with parole eligibility at fifteen years, sufficient punishment for appellant's crimes. In extending this offer, the court and prosecutor no doubt considered the fact that none of the complaining witnesses was injured. See People v. Smith, 270 A.D.2d 367 (2d Dept. 2000) (modifying the defendant's consecutive sentences imposed upon his convictions of robbery in the first and third degrees to run concurrently in the interest of justice); People v. Benoit, 251 A.D.2d 676 (2d Dept. 1998) (modifying the defendant's consecutive sentences for his convictions of three counts of attempted burglary in the second degree).

Accordingly, appellant's sentence should be modified in the interest of justice. See People v. Cosme, 203 A.D.2d at 376.

X.    **Appendix C**: Petitioner's Initial Application for Leave to the New York Court of Appeals



90 CHURCH STREET,   NEW YORK, N.Y. 10007   TEL: (212) 577-3300   FAX: (212) 577-7999   www.legal-aid.org

Daniel L. Greenberg
*Executive Director and
Attorney-in-Chief*

*Criminal Appeals Bureau*
Andrew C. Fine
*Attorney-in-Charge*

July 16, 2001

The Honorable Judith S. Kaye
Chief Judge
Court of Appeals
Court of Appeals Hall
Eagle Street
Albany, New York 12207

Attn.: Hon. Stuart M. Cohen

                    Re: <u>People</u> v. <u>David Garcia</u>
                        <u>Kings County Ind. No. 636/98</u>

Your Honor:

        Pursuant to Criminal Procedure Law §460.20, I am submitting
this letter as an application for permission to appeal to the
Court of Appeals in the above-referenced case, which involves
appeals from two judgments, though begun with a single
indictment.  Mr. Garcia's case was severed, he was convicted
after two trials, and the Appellate Division, in separate
opinions, affirmed each conviction.  We seek leave to appeal both
judgments in this one application because the appeals raise, in
part, identical issues, and the Court may wish to consolidate
them.  An application has not been made to a justice of the
Appellate Division.

        On June 18, 2001, the Appellate Division, Second Department,
affirmed, by separate opinions, judgments of the Supreme Court,
Kings County, rendered on October 26, 1998, convicting appellant,
after a jury trial, of attempted murder in the second degree and
robbery in the first degree and on January 21, 1999, convicting

appellant, after a jury trial, of eight counts of robbery in the first degree, and sentencing him to aggregate determinate terms of fifty years and seventy-five years, respectively (Albert Tomei, J.).

Appellant had no co-defendants below.

*I am enclosing copies of the briefs filed in the Appellate Division and that Court's orders and opinions. We request this Court to consider and review all issues outlined in defendant-appellant's briefs.* Please advise me of the judge designated to decide this application so that I may send a follow-up letter in support of the application. (Emphasis added by instant court.)

Respectfully,

Katheryne M. Martone
Appellate Counsel
(212) 577-7993

Encls.

cc: Hon. Charles J. Hynes
    District Attorney
    Kings County
    Renaissance Plaza
    350 Jay Street
    Brooklyn, New York 11201-2908

    Attn.: Diana Villanueva
           Assistant District Attorney